UNITED STATES BANKRUPTCY COURT
GEORGE C. YOUNG FEDERAL COURTHOUSE
400 WEST WASHINGTON STREET, SUITE 5100
ORLANDO, FL 32801

In re:

                           Case No. 6:17-bk-00294-KSJ

CATHERINE ECKLEY BENTLEY,           Chapter 7 Debtor.
_____

SUSAN KOLB, M.D.,                  Adv. No. 6:17-ap-00047-KSJ Plaintiff, v.
CATHERINE ECKLEY BENTLEY, Defendant.
_____

ROBERT E. THOMAS,              Adv. No. 6:17-ap-00048-KSJ Plaintiff, v.
CATHERINE ECKLEY BENTLEY, Defendant.
_____

SUSAN KOLB, M.D.,                  Adv. No. 6:17-ap-00119-KSJ Plaintiff, v.
CATHERINE ECKLEY BENTLEY, Defendant.
_____/

## DEBTOR'S CLOSING ARGUMENT AND TRIAL MEMORANDUM OF LAW

Debtor/Defendant, CATHERINE ECKLEY BENTLEY, by and through the undersigned

counsel, submits the following closing argument and trial memorandum of law based on

evidence adduced at trial:

## STATEMENT OF FACTS ESTABLISHED AT TRIAL

Creditor's claim arises from an unliquidated breach of contract claim on two secured

promissory notes allegedly executed by the Debtor's son, Lynford Bentley, deceased. The first

promissory note in the amount of $50,000 listed 1961 Rolls Royce as collateral and was

admittedly drafted by Creditor. The first note was executed by Lynford Bentley on May 16,

2006. [1] The second promissory note, also in the amount of $50,000, listed 1930 L29 Cord as

collateral and was admittedly drafted by Creditor's attorney.[2] Creditor alleges that the second

promissory note was executed by Lynford Bentley on May 26, 2006.[3]

Creditor alleges that she only received 6 payments from Lynford Bentley, with the

last payment made on February 16, 2007.[4] According to Creditor's spreadsheet of payments,

~~Creditor~~ Following Lynford Bentley's default, Creditor took no action to enforce the alleged obligation, even after she accelerated the note(s) on February 12, 2008.[5] On December 8, 2009, Mr. Bentley died intestate.[6] ~~It is undisputed that~~

Following Lynford Bentley's death, Creditor ~~did not bring any action against Mr. Bentley during almost 3 years of his life following his alleged default on the note(s).Creditor knew~~ waited another 4 years to bring an action to enforce the alleged debt. However, despite being on notice that Debtor was the mother of Lynford Bentley and ~~therefore,~~ was his sole heir.[7] ~~Creditor was not aware of any other living heirs of Mr. Bentley. Creditor admitted that the Cord is the asset of the Lynford Bentley's estate.[8] Creditor also admitted that she was aware that when a person dies, the decedent's property passes to the decedent's heirs.[9] In fact, Creditor's attorneys specifically advised Creditor that she needed to open a probate estate to pursue a claim against Mr. Bentley's assets at issue, the Rolls Royce and the Cord.[10] Despite her knowledge that Ms. Bentley was the heir of Lynford Bentley's estate and that probate~~[7] and despite being advised by her lawyers that a probate estate was necessary to pursue a claim against an asset of his estate ~~assets, she took no action for almost 4 years following Mr. Bentley's death.Then,~~[8] Creditor made a conscious decision not to follow the proper legal process and thereby deprive Ms. Bentley of her property rights to the vehicles at issue without notice and a right to be heard. Specifically, instead of opening ~~a probate~~ an estate, Creditor sued Belinda Horne in civil court on December 6, ~~2013, Creditor sued Mr.Bentley's girlfriend, Belinda Horne,~~ 2013 for fraudulent conveyance and injunctive relief alleging that Ms. Horne took all of Lynford Bentley's possessions after his death and retained, distributed, or disposed of all of them.[9] Creditor admitted that she sued Belinda Horne a few days short of the statute of limitations running on conversion.[10] Creditor also admitted that at no point prior to suing Belinda Horne did she notify

---

[1] Creditor's Exhibit 14
[2] Creditor's Trial Testimony 237:18-237:24
[3] Creditor's Exhibit 15
[4] Creditor's Trial Testimony 277:25-278:12
[5] Creditor's Exhibit 68, proof of claim
[6] Creditor's Exhibit 61 ¶ 2
[7] Adversary Complaint ¶ 11.[8] ~~Creditor's Trial Testimony 73:24-274:2~~ [9] ~~Creditor's Trial Testimony 270:19-270:22~~ [10]
[8] Creditor's Trial Testimony 271:25-272:22
[9] Creditor's Exhibit 61 ¶ 17
[10] Creditor's Trial Testimony 296:18-296:22

Ms. ~~Horne took all of Mr. Bentley's possessions after his death and retained, distributed, or disposed of all of them.~~ [11] ~~Creditor admitted that she sued Belinda Horne a few days short of the statute of limitations running on conversion.~~[12] ~~Creditor admitted that at no point prior to suing Belinda Horne did she notify Ms.~~ Bentley that Creditor had a claim against the Cord.[13] ~~Creditor also presented no proof at trial that Ms.~~ [11] ~~Bentley had knowledge of Creditor through any other means.~~

On or about May 30, 2014, after the statute of limitations on all of creditor's claims ran, Ms. Bentley, with assistance of some friends, travelled to Georgia to coordinate transport of the Cord from Georgia to Florida. ~~After the Cord was moved to Florida, it~~ [12] where she had to ~~be stored in~~ store it at All Aboard Storage due to its exceptional length. ~~Creditor did not notify~~ [13] Having learnt that Ms. Bentley ~~that Creditor had a claim against~~ finally took possession of the Cord ~~until~~, Creditor took ~~Ms. Bentley's~~ her deposition in January of 2015 ~~to find out~~ and attempted to force her to disclose the location of the Cord. ~~Despite being~~, while on express notice that Ms. Bentley claimed ownership to the Cord ~~and had.~~ [14]

When Creditor learnt of the location of the Cord, she again attempted to go behind Ms. Bentley's back to take possession of ~~it, Creditor~~ the Cord when she filed a motion in ~~the pending~~ Georgia ~~lawsuit against Belinda Horne~~ to obtain a temporary writ of possession of the Cord against Belinda Horne. She never served Ms. Bentley with the motion or with the notice of hearing. On June 11, 2015, the Georgia court held a hearing on Creditor's Motion ~~for an Interlocutory Writ of Possession.~~ [17][15] However, Creditor never ~~notified Debtor about the~~ hearing ~~or~~ informed the ~~Court~~ Georgia court that Ms. Bentley, the sole heir of her son's estate, ~~took possession of the Cord claiming to be the owner of the Cord.~~ claimed to be the owner of the Cord. Instead, Creditor painted

~~[11] Creditor's Exhibit 61 ¶ 17.~~ [12] ~~Creditor's Trial Testimony 296:18-296:22.~~ [13] ~~Creditor's Trial Testimony 223:15-223-18.~~ [14] ~~Plaintiff's Exhibit 49, 8:7-8:8.~~ [15] ~~Plaintiff's Exhibit 49, 18:1-18-6.~~ [16] ~~Plaintiff's Exhibit 49.~~ [17] ~~Debtor's Exhibit 2~~

Ms. Bentley as a co-conspirator of Belinda Horne.

Having not been on notice of the pending motion for a writ of possession, Ms. Bentley consigned the Cord to Sotherby's Auction. On June 27, 2015, the Cord was moved

to the Sotherby's auction ~~since the auction pressured Debtor~~. Ms. Bentley was not engaged

in a fire sale of the Cord to circumvent repossession of Creditor, instead, Debtor was

pressured by the auction to sell ~~it.[18]~~ ~~On~~ the Cord.[16]

After Ms. Bentley consigned the Cord and after it was moved to Sotherbys auction, on

July 20, 2015, the Georgia Court entered a writ of possession against Belinda Horne.~~[19]~~[17] Again,

[11] Creditor's Trial Testimony 223:15-223-18
[12] Plaintiff's Exhibit 49, 8:7-8:8
[13] Plaintiff's Exhibit 49, 18:1-18-6
[14] Plaintiff's Exhibit 49
[15] Debtor's Exhibit 2
[16] Debtor's Exhibit 32
[17] Debtor's Exhibit 3

Creditor never served Ms. Bentley with the Writ of Possession or otherwise informed

Ms. Bentley that she had a writ of possession concerning the Cord.

On July 27, 2015, Creditor filed and recorded the Writ of Possession in Florida to

domesticate the foreign judgment and served the required notice upon Belinda Horne and All

Aboard Storage, but not upon Debtor.~~[20]~~[18] ~~Again, Creditor failed to serve the notice upon~~

~~Debtor.~~Consequently, having not received any notice of the pending writ of possession from

Georgia, the Cord was sold at auction on September 5, 2015.

~~On~~After the Cord was sold at auction, on September 14, 2015, Creditor obtained a

Break Order to All Aboard Storage~~[21]~~[19] and a Writ of Replevin in Florida.~~[22]~~[20] ~~However~~Creditor

obtained such orders without informing the Florida court that Ms. Bentley claimed ownership to

the Cord and without giving Ms. Bentley an opportunity to be heard and oppose the relief

sought. Furthermore, Creditor failed to serve Debtor with either one of these orders. ~~On October~~

~~5, 2015, the~~Instead, Creditor moved to execute the orders on All Aboard Storage through

Sheriff on October 5, 2015.[21] Clearly, the execution of these orders did not return any results

since the Cord was sold a month before.

Again, without any notice that there was a Writ of Replevin ~~was served upon All~~

~~Aboard Storage.~~[23] ~~On~~issued by the Florida Court, on October 8, 2015, Debtor applied $98,000

of the proceeds from the sale of the Cord to pay off her mortgage.[24] ~~On[22]~~ After Ms. Bentley paid off her mortgage, on October 9, 2015, Creditor obtained an order to show cause on her motion for contempt against Ms. Bentley.~~[2523]~~[23] The hearing was held on October 21, ~~2015.[26] At~~2015, but had to be continued due to the ~~hearing, Ms. Bentley advised the court that the Cord was sold on September 5, 2015 and that she applied the proceeds from sale to pay off her mortgage.[27]~~ Court's schedule.[24]

~~On February 25, 2016,~~

Once Creditor's actions over ~~9~~the course of two years ~~after Mr~~to deprive Ms. Bentley ~~allegedly defaulted on the note(s) and over 6 years after he died, Creditor sued Debtor in Florida for fraudulent transfer.[28] At the~~of notice and opportunity to be heard with respect to her property rights in the Cord failed, Creditor finally

---

[18] ~~Debtor's Exhibit 32.[19] Debtor's Exhibit 3.[20]~~Debtor's Exhibits 6 & 7.~~[21]~~
[19] Debtor's Exhibit 8.~~[22]~~
[20] Debtor's Exhibit 9.~~[23]~~
[21] Debtor's Exhibit 10.~~[24]~~
[22] Debtor's Exhibit 11.~~[25]~~
[23] Debtor's Exhibit 12 & 13.~~[26] Debtor's Exhibit 14.[27] Plaintiff's Exhibit 52, 15:3, 16:16-16:20, 10:14-10:16, 17:17:17:18.[28] Debtor's Exhibit 15~~
[24] Debtor's Exhibit 14

---

sued Ms. Bentley on February 25, 2016 claiming that Ms. Bentley was the one who defrauded her. However, even then, Creditor only brought an action for fraudulent transfer.[25] At the same time, Creditor filed a Notice of Lis Pendens.~~[2926]~~[26] On April 8, 2016, Creditor sued ~~Debtor~~Ms. Bentley in Georgia for criminal theft, fraudulent transfer, writ of possession, injunctive relief, and executor de son tort.~~[3027]~~[27] To this date, however, Creditor has not sued ~~Debtor~~Ms. Bentley for conversion or opened a probate estate. ~~[3128]~~[28]

On January 13, 2017, Debtor filed a Chapter 7 petition in this court. The meeting of creditors was held and concluded on February 28, 2017. Neither the Chapter 7 Trustee, ~~not~~nor Creditor filed an objection to Debtor's exemptions within the required 30 day period~~, nor did they attempt to take Debtor's Rule 2004 examination during this time~~.

Instead, on April 17, 2017, Creditor filed an adversary proceeding against Debtor to determine nondischargeabiltiy of the alleged debt under sections 523(A)(2)(A), 523(A)(4), 523(A)(6) and for a denial of discharge under section 727(a)(2)(A).[32][29]

Creditor failed to prove her claim under section 727(a)(2)(A) since Creditor's first adversary complaint does not even identify any property that Debtor transferred within a year of bankruptcy to deny discharge under section 727(a)(2)(A).[33][30] In discovery, Creditor admitted that she has no information to show that Debtor transferred any property that was property of the estate within one year of the filing of the bankruptcy petition. [34][31] Likewise, at trial, Creditor was not able to identify any such property and instead claimed that she would have to look at when the Cord was transferred.[35][32]

[25] Debtor's Exhibit 15
[26] Debtor's Exhibit 16
[27] Debtor's Exhibit 17
[28] Creditor's Trial Testimony 302:20-303:8, 272:6-272:7
[29] Dkt. #1, 6:17-ap-00047-KSJ
[30] Dkt. #1, 6:17-ap-00047-KSJ
[31] Debtor's Exhibit 25, ¶2 & 26, ¶¶6,7,8
[32] Creditor's Trial Testimony 300:4-300:25

With respect to sections 523(A)(2)(A), 523(A)(4), 523(A)(6), Creditor failed to establish at trial that there is a valid debt and that the liability for it falls within one of the excepted

[29] Debtor's Exhibit 16 [30] Debtor's Exhibit 17 [31] Creditor's Trial Testimony 302:20-303:8, 272:6-272:7 [32] Dkt. #1, 6:17-ap-00047-KSJ [33] Dkt. #1, 6:17-ap-00047-KSJ [34] Debtor's Exhibit 25, ¶2 & 26, ¶¶6,7,8 [35] Creditor's Trial Testimony 300:4-300:25 classes. First, Creditor admitted that she filed sued against Belinda Horne a few days short of the statute of limitations.[36][33] However, she did not sue Ms. Bentley until two years later, well after the statute of limitations ran, and to date, she did has not sue sued Ms. Bentley for conversion.

Creditor also failed to present any evidence to prove her claim of conspiracy between Belinda Horne and Debtor. Instead, based on Creditor's testimony, her claim of conspiracy is based on pure speculation.

Specifically, Creditor testified during trial that Debtor knew that Creditor had writ of possession as to the Cord prior to the Cord being taken by Debtor from Horne's cousin in Georgia and that said knowledge "implies" a conspiracy.[37][34] However, Creditor did not obtain the writ of

possession against Belinda Horne until July 20, 2015, which is over a year after Debtor moved

the Cord from Georgia to Florida.[3835] Creditor also testified that the basis of her alleged

conspiracy was the four phone calls she identified at trial between Debtor and Horne.[3936]

However, Creditor ~~admitted that she~~ was not a witness to ~~any of~~ these phone calls and ~~had~~has

no knowledge of their substance, as well as all such phone calls took place after the statute of

limitations ran.[4037]

     Second, Creditor failed to establish the validity of the second promissory note. Creditor

presented no independent testimony that the second promissory note was signed by Lynford

Bentley, deceased. Creditor has not produced a cancelled check for the alleged $50,000 she paid

to Lynford Bentley.[4138] Instead, Creditor has provided only the front of the check.[4239] Creditor

claims that the money came out of her bank account but has not produced any documentary

~~evidence reflecting that the money came out of her account or that Lynford Bentley endorsed and~~

~~cashed said check.~~

---

[3633] Creditor's Trial Testimony 296:18-296:22[37]
[34] Creditor's Trial Testimony 293:1-293:7, 291:18-292:3[38]
[35] Creditor's Exhibit 56[39]
[36] Creditor's Trial Testimony 291:8-291:13[40]
[37] Creditor's Trial Testimony 295:4-295:10[41]
[38] Creditor's Trial Testimony 233:12-233:15[42]
[39] Creditor's Exhibit 16

evidence reflecting that the money came out of her account or that Lynford Bentley endorsed and

cashed said check.

     Additionally, all three sections, 523(A)(2)(A), 523(A)(4), 523(A)(6), require proof of

actual fraudulent intent. On May 16, 2018, Ms. Bentley was declared to be subject to total legal

disability by a court appointed panel of three licensed experts (a medical doctor, a doctor of

psychology, and a gerontologist) as confirmed by the Florida state court, the court of exclusive

jurisdiction for adjudicating incapacity matters, in the Order Determining Total Incapacity of

Debtor.[4340] Additionally, Creditor, a medical doctor, admitted at trial that vascular dementia can

appear overnight following an ischemic event and Creditor admitted that Debtor's MRI

showed microvascular ischemia in 2014.[40][41] Debtor's diminished mental capacity has been

documented clinically in her medical records.[42][45]

On July 27, 2017, Debtor filed a Motion to Allow Conveyance of Homestead Property

arguing that the Debtor's homestead had been removed from the bankruptcy estate since there

was no objection to the claim of exemption.[46][43] On September 29, 2017, Trustee filed an

objection to the claim of homestead exemption citing to Fed. R. Bankr. P. 4003(b)(2) and 11

U.S.C. § 522(o).[47][44] However, at trial, Trustee has not presented any evidence to show that

Debtor "fraudulently asserted" the claim of exemption at the time of the bankruptcy filing,

which is the required showing under Fed. R. Bankr. P. 4003(b)(2).

On September 29, 2017, Creditor filed a second adversary proceeding against Debtor

for unjust enrichment, theft, equitable lien and constructive trust.[48][45] Creditor failed to establish

that ~~she~~

[40] Debtor's Exhibit 22
[41] Debtor's Exhibit 22
[42] Debtor's Exhibit 18
[43] Dkt. #34
[44] Dkt. #44
[45] Dkt #1, 6:17-ap-00119-KSJ

Creditor conferred a benefit upon Debtor to state a claim for unjust enrichment, ~~which is a contractual remedy~~. Creditor failed to establish existence of a confidential relationship

between Creditor and

[43] ~~Debtor's Exhibit 22~~ [44] ~~Debtor's Exhibit 22~~ [45] ~~Debtor's Exhibit 18~~
[46] ~~Dkt. #34~~
[47] ~~Dkt. #44~~
[48] ~~Dkt #1, 6:17-ap-00119-KSJ~~ Debtor to state a claim for a constructive trust. Finally, Creditor
admitted that she has an adequate remedy at law since she can take possession of the Rolls
Royce ~~the alleged collateral securing the first promissory note,~~ as well as she can make a
claim under the title insurance policy obtained by Sotherby's auction.

**MEMORANDUM OF LAW AND CLOSING ARGUMENT**

I.     **TRUSTEE'S OBJECTION TO HOMESTEAD EXEMPTION MUST
BE OVERRULED AS A MATTER OF LAW**

Trustee filed an objection to Debtor's claim of homestead exemption "based on the use of fraud-tainted funds to invest in the homestead property pursuant to Fed. R. Bankr. P. 4003(b)(2) and 11 U.S.C. § 522(o)." Trustee's reliance on both Rule 4003(b)(2) and 11 U.S.C. § 522(o) is misplaced and the Court should overrule the objection as a matter of law.

        **A.**    **Section 522(o) of 11 U.S.C. cannot be used as an independent basis of reducing the amount of exemption in the absence of a timely objection under Rule 4003(b)(1), as well as objection pursuant to § 522(o) cannot be made under the extended deadline of Rule 4003(b)(2).**

Section 522(o) does not provide an independent, substantive basis for objecting to a debtor's claim of exemption. *Moyer v. Rosich (In re Rosich)*, 582 B.R. 694, 698 (Bankr. W.D. Mich. 2018). Rather, section 522(o) merely provides the trustee with grounds to object to a debtor's homestead exemption claim and, if successful, decrease the amount that a debtor may claim as exempt. Therefore, this section does not dispense with the strict time limitations for filing an objection under Rule 4003(b)(1). *Menotte v. Champalanne (In re Champalanne)*, 425 B.R. 707, 712 (Bankr. S.D. Fla. 2010), see also *Moyer v. Rosich (In re Rosich)*, 582 B.R. 694 (Bankr. W.D. Mich. 2018) (holding that challenges to the exemption of an interest in a debtor's residence based on a fraudulent transfer theory under section 522(o) must be brought within the

time prescribed in Rule 4003(b)(1), rather than Rule 4003(b)(2)), *In re Castellano*, 550 B.R. 214 (Bankr. E.D.N.Y. 2016) (overruling trustee's objection to exemption under Rule 4003(b)(2) on the basis that debtor's pre-petition conduct was in bad faith and constituted fraud on his creditors when the exemption claim itself was not fictitious or fraudulently claimed), *Law v. Siegel*, 571 U.S. 415, 134 S. Ct. 1188 (2014) (overruling trustee's objection on the basis of debtor's fraudulent conduct in attempting to insulate his homestead exemption by holding that bankruptcy courts have no power to deny exemption on the basis of debtor's bad faith).

Here, having failed to file a timely objection under Rule 4003(b)(1), Trustee cannot

rely on 11 U.S.C. § 522(o) independently or under the extended deadline of Rule 4003(b)(2).

Therefore, Trustee's objection must be overruled as a matter of law.

**B.  Trustee's objection must be overruled because Rule 4003 (b)(2) requires Trustee to prove that the exemption was fraudulently claimed at the time of bankruptcy filing, rather than fraudulently created pre-petition, which is the sole basis for Trustee's objection in this case.**

Trustee has not demonstrated or even alleged that the exemption claim itself was fictitious or fraudulently claimed, rather the basis for Trustee's exemption is Debtor's pre-petition conduct, which he alleges was done to defraud creditors. Therefore, Trustee's objection under the extended deadline of Rule 4003(b)(2), which requires Trustee to prove that the exemption was fraudulently claimed at the time of bankruptcy filing, rather than fraudulently created, must be overruled.

Rule 4003 was amended in 2008 to provide a longer deadline for objecting to exemptions "if the debtor fraudulently asserted the claim of exemption." *See* Fed. R. Bankr. P. 4003(b)(2) (as amended effective Dec. 1, 2008). Rules address procedure in connection with a case, not substantive consequences of prepetition activity. 28 U.S.C. § 2075. Therefore, Rule 4003(b)(2) cannot be used as an independent substantive basis for objecting to a debtor's claim of

exemption. *In re Rosich* at 699. Rather, Rule 4003(b)(2) is to be read as requiring the trustee to show that the debtor fraudulently "asserted the exemption at the time the exemption was claimed." *Moyer v. Rosich (In re Rosich)*, 582 B.R. 694, 698 (Bankr. W.D. Mich. 2018) (holding that Rule 4003(b)(2) cannot be used as a basis for denying a claim of exemption based on the debtor's bad faith in claiming the exemption, or pre-petition transfer or misconduct, rather the focus is on the debtor's actions in claiming the exemption at the time of bankruptcy filing); *In re Hoover*, 574 B.R. 413 (Bankr. D. Mass. 2017) (overruling trustee's objection under Rule 4003(b)(2) on the basis that trustee was not asserting that the exemption claim itself was fictitious or that the claimed exemption was not legitimately available, when trustee challenged the propriety of the debtor claiming an exemption based on bad faith); *In re Castellano*, 550 B.R. 214 (Bankr. E.D.N.Y. 2016) (overruling trustee's objection to exemption under Rule 4003(b)(2) on the basis that debtor's pre-petition conduct was in bad faith and constituted fraud on his creditors when the exemption claim itself was not fictitious or fraudulently claimed); *Whatley v. Stijakovich-Santilli (In re Stijakovich-Santilli)*, 542 B.R. 245, 255 (9th Cir. BAP 2015) (holding that the objector must not only show that the facts do not support the exemption, but must also prove that the debtor knowingly intended to deceive the trustee and the creditors at the time the exemption was claimed), *Law v. Siegel*, 571 U.S. 415, 134 S. Ct. 1188 (2014) (overruling trustee's objection on the basis of debtor's fraudulent conduct in attempting to insulate his homestead exemption by holding that bankruptcy courts have no power to deny exemption on the basis of debtor's bad faith).

Despite clear authority to the contrary as discussed above, Trustee relies on *In re*

*Woolner,* No. 13-57269-wsd, 2014 Bankr. LEXIS 5048 (Bankr. E.D. Mich. Dec. 15, 2014). *In re*

*Woolner* represented a minority view and it was overruled by a subsequent decision from the Sixth Circuit in *Ellmann v. Baker (In re Baker)*, 791 F.3d 677 (6th Cir. 2015).

Consequently, to trigger the longer deadline of Rule 4003(b)(2), Trustee must prove that the facts do not support the claim of exemption and that the Debtor knew, at the time she claimed the exemption, that the facts did not support that claim, and that she intended to deceive the trustee and creditors who read the schedules. *In re Stijakovich-Santilli at 256, In re Rosich* at 698.

Therefore, Trustee's objection under Fed. R. Bankr. P. 4003(b)(2) is insufficient as a matter of law since Trustee has to prove that Debtor "fraudulently asserted" the claim of exemption at the time of the bankruptcy filing, yet Trustee's objection is rather based on how it was created - "based on the use of fraud-tainted funds to invest in the homestead property" that occurred over a year prior to filing bankruptcy:

> <u>Trustee's Objection to Debtor's Motion to Allow Conveyance of Homestead</u> (Dkt. 34)**:**
> "The Trustee does not take issue with the Debtor's claim that the Home meets the requirements for homestead protection under Article X, § 4(a)(1) of the Florida Constitution and §§ 222.201 and 222.201, Florida Statutes. However, the Debtor cannot use her claim of a homestead exemption in the Home to perpetrate a fraud on Dr. Kolb and other creditors, as she proposes to do by putting an exempt asset beyond their reach by means of a fraudulent transfer."
>
> <u>Debtor's Exhibit 28, Request for Admissions No. 2</u>: Admit that Plaintiff has no information to show that Defendant's homestead property was not Defendant's principal residence at the time of bankruptcy filing.
> <u>Response</u>: Admitted.
>
> <u>Debtor's Exhibit 28, Request for Admissions No. 5</u>: Admit that the substantive basis of Plaintiff's objection to Defendant's claim of homestead exemption under Rule 4003(b)(2) is related to the Defendant's alleged misconduct that occurred at least a year prior Defendant's filing for bankruptcy.
> <u>Response</u>: Without knowledge. The activities to which Plaintiff is aware occurred at least one year prior to the Petition Date. Nevertheless, Plaintiff is not aware of the timing of Debtor's use of certain other proceeds received from the sale of the subject Cord.

Since the basis of the Trustee's objection under Rule 4003(b)(2) is Debtor's pre-petition conduct involving the creation of the exemption, rather than any fraud in claiming the exemption at the time it was asserted, Trustee's objection must be overruled as a matter of law.

### C.     Bankruptcy courts have no jurisdiction to impose an equitable lien or a constructive trust on exempt property after it was removed from the estate.

Pursuant to § 541(a) of the Bankruptcy Code, the commencement of a bankruptcy case

creates an estate. 11 U.S.C. § 541(a). An exemption is an interest withdrawn from the estate

(and hence from the creditors) for the benefit of the debtor." *Owen v. Owen*, 500 U.S. 305, 308

(1991). Therefore, by claiming an exemption, a debtor may remove certain property from the

estate. *Id.*

      11 U.S.C. § 522(1) provides that exemptions listed on Schedule C are presumptively

valid in the absence of an objection. The failure to file a timely, written objection to a claimed

exemption is an absolute bar to any attempts to reduce or challenge the exemption. *In re Cannon*,

568 B.R. 859, 864 (Bankr. M.D. Fla. 2016), see also *Ezrol v. Lane (In re Lane),* 190 B.R. 125

(Bankr. S.D. Fla. 1995). Moreover, once exempt property is withdrawn from the estate, 11

U.S.C. § 522(c) permanently immunizes it from pre-petition debts. *Owens* at 308. The Eleventh

Circuit has held that once the property is removed from the bankruptcy estate through

exemption, the debtor may use it as his own, free of the administration of the bankruptcy trustee.

*Gamble v. Brown (In re Gamble)*, 168 F.3d 442, 444 (11th Cir. 1991) An order returning such

exempt property to the administration of the trustee, such as by allowing imposition of an

equitable lien or constructive trust on exempt property, would be tantamount to allowing an

untimely objection and would override specific provision of the Bankruptcy Code containing

express exceptions to the rule that exempted property cannot be used to satisfy pre-petition debts

as well as the bankruptcy court has no jurisdiction over property removed from the estate. *Id.*,

see also *Mazon v. Tardif (In re Mazon)*, 395 B.R. 742, 747 (M.D. Fla. 2008).

The timeliness of a complaint to impose an equitable lien on exempt property has been addressed
in several cases, most recently and unequivocally in *Levine v. Azzata*, 2016 U.S. Dist. LEXIS
190408 (S.D. Fla. May 27, 2016). In *Levine*, debtor claimed his property exempt under the
homestead exemption and the Florida tenancy-by-the-entireties (TBE). Creditor filed a limited
objection to debtor's homestead exemption, but did not expressly object to the TBE exemption.
Debtor filed a motion to dismiss Plaintiff's equitable lien claim (Count IV) for failure to timely
object to the TBE exemption. The court expressly stated that "failure to make a timely objection
generally precludes a later challenge to the exemption." *Id*. at 7 citing to *Law v. Siegel*, 134 S.Ct.
1188, 1196, 188 L. Ed. 2d 146 (2014) (citing *Taylor v. Freeland & Kronz*, 503 U.S.
638, 643-644, 112 S. Ct. 1644, 118 L. Ed. 2d 280 (1992)). However, the court denied the motion

concluding that the creditor's motion to lift automatic stay to pursue a pre-bankruptcy action for

an equitable lien against the property constituted to a timely objection to all claims of

exemptions to the property since it was filed prior to the deadline for filing the objections.

Similarly, in *In re Champalanne*, 425 B.R. 707 (Bankr. S.D. Fla. 2010), Chapter 7

Trustee filed a complaint against debtors to avoid and recover fraudulent transfers under 11

U.S.C.S. §§ 548(e)(1), 544(b) and applicable Florida law seeking to impose an equitable lien or

equitable trust on the homestead property. The trustee argued that under 11 U.S.C. § 522(o), a

creditor may set aside any portion of the homestead that a debtor acquired with the intent to

delay, hinder, or defraud creditors. The court ruled that subsection (o) provides a trustee with

grounds to object to a debtor's homestead exemption claim and, if successful, decrease the

amount that a debtor may claim as exempt. However, to make use of this subsection, the proper

remedy is to file an objection to exemption, not to file an adversary proceeding seeking to avoid

a fraudulent conveyance.

In *In re Statner*, 212 B.R. 164 (Bankr. S.D. Fla. 1997), on the last date to file objections to the
debtor's claimed exemptions, the trustee filed a Motion for Extension of Time to Object to
Claimed Exemptions, to which the debtor objected. The court granted the trustee's motion, and the
debtor filed a motion for reconsideration. Within the extended time allotted by the court, the trustee
filed an adversary proceeding objecting to the homestead exemption and seeking imposition of an
equitable lien on the claimed homestead property. The debtor argued that the court had no
jurisdiction to extend the time period for objecting to exemptions subsequent to the expiration of
the 30-day period, even if a Motion for Extension of Time was filed prior to the expiration of the
30-day deadline. The court considered decisions of other courts and held that it had the authority to
grant a motion for extension of time to file objections to a debtor's claim of exemption as long as
such motion was timely, i.e., filed within the 30 days period to file an objection. Notably, in its
analysis, the court expressly noted that "[a]lthough this Court finds [the trustee's] objections to [the
debtor's] claimed homestead exemption to be timely, based upon the undisputed facts and
applicable law, the homestead exemption must be upheld." *Id*. at 167. This is significant because
the court specifically addressed the issue of timeliness of the objection first before proceeding to
the merits of the request for an equitable lien.

In *In re Dudley*, 68 B.R. 426 (Bankr. S.D. Fla. 1986), debtor filed a motion to avoid a

pre-petition judicial lien imposed as a constructive trust against a homestead property and the

judgment creditor opposed the motion. The bankruptcy court considered the issue, but only after

it determined that the opposition was timely:

"The condominium was claimed exempt as a homestead when this case was filed. (C. P.
No. 4). This court required: "Unless extended, objection to debtor's claim of exempt

property must be filed within 30 days after the Section 341(a) meeting". The deadline had not expired when the instant motion was filed and was opposed by the judgment creditor. The issue thus presented and now before me constitutes a timely challenge of the claimed exemption." *Id.* at 428.

In *In re Moody*, 77 B.R. 566 (S.D. Tex. 1987), the trustee filed an adversary proceeding to set aside the debtor's transfers of real property, designated as his homestead, as fraudulent conveyances under 11 U.S.C.S. § 548 and seeking to impose a constructive trust or equitable lien on this homestead property. Debtor argued that the trustee's lawsuit to set aside fraudulent conveyance was actually a collateral attack on the claimed homestead exemption due to the trustee's failure to timely object to the claim of exemption. Although the trustee failed to timely object, the trustee was allowed to join a timely objection filed by a creditor. If the party in interest did not timely object, trustee's complaint would have been dismissed.

In this case, imposition of the equitable lien or constructive trust upon the exempt property after the property had been removed from the estate would be tantamount to allowing an untimely objection since it would reduce the amount of the exemption. Therefore, imposition of the equitable lien in this case is beyond the jurisdiction of the bankruptcy court and its equitable authority under section 105(a) and would create remedies and rights in derogation of the Bankruptcy Code and Rules.

## II.    DETERMINATION OF NONDISCHARGEABILITY OF DEBT UNDER SECTION 523(A)(2)(A), SECTION 523(A)(4), SECTION 523(A)(6)

Plaintiff's Complaint seeks a determination that the debt owed is nondischargeable under section 523(a)(2)(a), section 523(a)(4), and section 523(a)(6). There is a two-step inquiry for determining dischargeability of a debt in the context of conversion and willful and malicious injury: first, whether there is a valid debt, and if there is, 2) whether liability for it falls within one of the excepted classes. *Davis. v. Aetna Acceptance Co.,* 293 US 328 (1934). If the

limitations period on the promissory note has expired and a creditor has not established a debt by obtaining a judgment for the amounts due under a promissory note, creditor cannot maintain an action for nondischargeability of that debt. *Wilcox v. Dopson (In re Dopson)*, 2018 Bankr. LEXIS 1258 (Bankr. N.D. Ga. Apr. 27, 2018). If suit is not brought within the time period allotted

under state law, then a debt cannot be established or maintained because it is barred by statute of limitations. *Id.*

Since the statute of limitation on the promissory note and security agreement has expired, Creditor cannot maintain an action under Georgia law to establish a valid debt or foreclose on the alleged security interest. Even if the statute of limitations did not bar the Creditor's claims, Creditor still cannot establish a valid debt because she failed to establish the validity of the underlying promissory note, as well as the promissory note at issue is a general unsecured note. Finally, Creditor has not met her burden of proving that Debtor acted with an actual fraudulent intent to establish that the liability for the alleged debt would fall under the subject seconds. Therefore, Creditor cannot maintain an action for nondischargeability under sections 523(a)(2)(a), section 523(a)(4), and section 523(a)(6).

## A. Bankruptcy Court has no jurisdiction over assets Lynford Bentley's estate.

Georgia probate courts have original and exclusive jurisdiction concerning the "disposition of the property… belonging to deceased persons estates;" O.C.G.A. 15-9-30 (4); *In Re Estate of Long*, 706 S.E.2d 704 (2011)("Probate courts have "original, exclusive, and general jurisdiction" over the probate of wills and all other matters and things as appertain or relate to estates of deceased persons.")

The United States Supreme Court held that the probate exception "reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate" and also "precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court." *In re Boisseau,* 2017 U.S. Dist Lexis 11964, at 8 (N.D.N.Y. 2017)(quoting *Marshall v. Marshall*, 547 U.S. 293, 311-12 (2006)).

The Eleventh Circuit Court of Appeals has limited the "probate exception" to only "matters premised on diversity jurisdiction." *In re Estate of Hughes*, 2010 U.S. Dist. LEXIS 51232, at 5 (M.D. Fla. 2010); *In Re Goerg*, 844 F.2d 1562, 1565 (11th Cir. 1988).

In the present case, it is undisputed that the Creditor and the Debtor are diverse in citizenship given that at all relevant times, Creditor was domiciled in Georgia and Debtor was

domiciled is in Florida. Creditor, in her adversary complaint, is seeking to litigate the disposition

of property that Creditor admits was part of Lynford Bentley's estate and that she was a creditor

of the estate. (Creditor's Trial Testimony 273:25- 274:5). Consequently, this Court is without

jurisdiction to hear Creditor's claims.

**B.    Plaintiff's claims cannot be maintained under Georgia law because all of them are time barred.**

Since the statute of limitation on the promissory note and security agreement has expired,

Creditor cannot maintain an action under Georgia law to establish a valid debt or foreclose on the

alleged security interest.

### 1.    All of Creditor's claims are governed by Georgia Law

Florida courts consider the following factors to determine which law to apply: (1) the

local law of the state having the most significant relationship to the issue and to the parties; (2)

the place where the injury occurred; (3) the domicile, place of incorporation, and the place of

business of the parties; and (4) the place where the relationship between the parties is centered.

*In re World Vision Entm't, Inc*., 275 B.R. 641, 661 (Bankr. M.D. Fla. 2002).

Applying these facts to this case, the Court should apply the law of Georgia to all of

Creditor's claims because most of the activities that led to this litigation took place in Georgia:

the alleged injuries occurred in Georgia, the parties to the promissory notes were residents of

Georgia, the notes were allegedly signed and defaulted on in Georgia, the alleged collateral

securing the promissory notes was located and registered in Georgia, the Rolls Royce is still

located in Georgia, Lynford Bentley's estate assets are still located in Georgia, Creditor claims

that the theft of the Cord occurred in Georgia. Finally, Creditor expressly admitted that her

causes of action are subject to Georgia Law, as well as she submitted herself to Georgia

jurisdiction by suing Ms. Bentley in Georgia. Debtor's Exhibit 17, ¶ 2 of Creditor's Amended

Complaint.

### 2.    All of Plaintiff's claims are barred by Statute of Limitations

Georgia has adopted the Uniform Commercial Code (the "UCC") as part of the Official Code of Georgia Annotated ("O.C.G.A."). Article 9 of UCC governs secured transactions. Upon default, a secured party can enforce its security interest in accordance with the rights afforded by the UCC and the parties' agreement. O.C.G.A.§11-9-601(a). A secured party may reduce a claim to judgment, foreclose, or enforce its rights by any available judicial procedure. § 11-9-601(a)(1)-(2). Although a secured party may also take possession of the collateral, it must use judicial process if enforcement will breach the peace. O.C.G.A. §11-9-609(b).

Since Creditor has never taken possession of the collateral, Creditor's remedies are limited to reducing her claim to judgment either on the basis of the promissory note or conversion of the collateral if she has a security interest in the collateral, both of which are time barred.

**a.**     ***The Statute of Limitations for the suit to enforce the promissory notes ran on 02/12/2014***

Negotiable instruments are governed by Article 3 of the UCC. Section 11-3-118 of O.C.G.A.     establishes that "an action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within six years after the due date or dates stated in the note or, if a due date is accelerated, within six years after the accelerated due date."

Creditor claims Lynford Bentley made the last payment on the notes on 2/16/07 and she issued a notice of default or accelerated the note on 2/12/08. See Creditor's Proof of Claim, Exhibit L. Therefore, the six year statute of limitations started to run from the date Creditor accelerated the note on 02/12/08 and it ran six years later on 02/12/2014.

Since Creditor never filed suit on the notes by 02/12/2014, her actions fall outside of the limitations set forth by §11-3-118 of O.C.G.A. and Creditor cannot enforce the debt to seek a determination of its nondischargeability, as well as the debt did not belong to Ms. Bentley.

**b.**     ***Since the cause of action on the promissory note is time barred, so is the cause of action to foreclose on a lien on personal property allegedly securing the note.***

Creditor conceded that the statute of limitations on the promissory note ran. Doc. #54, Creditor's Response to Debtor's Objection to Claim, pages 7 - 10. Instead, Creditor alleges that she is not pursuing recovery of the underlying debt owed by the promissory notes, rather her claim arises from Debtor's "theft, conversion, etc. of that certain Cord car in violation of court orders directing Debtor to turn the car over to Dr. Kolb." *Id*. However, such an argument fails as a matter of law for two reasons. First, Georgia does not recognize a cause of action for civil theft; instead, Creditor's remedy is limited to an action for conversion of collateral and Creditor never brought a lawsuit for conversion and the Statute of Limitations to bring a claim for conversion ran on 12/09/13 – 12/16/13. Second, an action for foreclosure and sale of personal property collateral cannot be maintained after an action on the note is barred by the statute of limitations.

       i.      **Statute of Limitations for conversion ran on 12/09/2013 – 12/16/2013 and to this date, Creditor has not brought an action for conversion against Debtor.**

On May 16, 2016, Creditor filed a lawsuit against Ms. Bentley in Georgia (Debtor's Exhibit 17) alleging, among other things, that Ms. Bentley committed theft in violation of O.C.G.A.     §§ 16-8-2, 16-8-3 and 16-8-4, which are <u>criminal</u> statutes prohibiting theft by taking,

theft by conversion and theft by deception. Creditor also cited to a civil statute O.C.G.A. §§ 51-

10-6 as the basis of her claim for civil remedy. First of all, Ms. Bentley has not been charged or

found guilty of violation of the criminal offenses for Creditor to be entitled to remedies under

O.C.G.A.     § 51-10-6. (Creditor's Trial Testimony 303:16 – 30:22.) Second, the cited

criminal statutes do not authorize a private right of action for damages, rather Plaintiff's claim is

limited to a tort claim for conversion. *Stroman v. Bank of Am. Corp.*, 852 F. Supp. 2d 1366,

1380 (N.D. Ga. 2012).

      Furthermore, review of relevant case law indicates that the tort statute cited by Creditor,

O.C.G.A.     §§ 51-10-6, has not been used to create a civil remedy for violations of the criminal

theft by conversion statute. Despite the language of this statute expressly providing for a civil

recovery for theft under Article 1, Chapter 8, Title 16, which are criminal statutes discussed

above, case law indicates that Georgia has not used that provision to establish civil remedy for

the specific crime of theft by conversion. *In re Osbourne*, Order on Supplemental Motions for

Summary Judgment (Docket No. 34), Case No. 10-82440-WLH, Adv. No. 10-82440-WLH

(Bankr. N.D. Ga. 2017) (citing to *Doyle Dickerson Co. v. Durden*, 218 Ga. App. 426 (1995);

*Pioneer Construction, Inc. v. May (In re May),* 518 B.R. 99 (Bankr. S.D. Ga. 2014); *Rolleston v.

Huie*, 198 Ga.App. 49 (1990)). Therefore, O.C.G.A. § 51-06-6 cannot be the basis for Creditor's

remedies. Instead, a secured creditor's remedy for improper disposition of property subject to a

security interest is limited to conversion. *Marvin Nix Dev. Co. v. United Cmty. Bank*, 302 Ga.

App. 566; 692 S.E.2d 23 (Ga. App. 2010).

"Actions for the recovery of personal property, or for damages for the conversion or destruction of the same, shall be brought within four years after the right of action accrues."
*O.C.G.A*        § 9-3-32. "The true test to determine when a cause of action accrues is to ascertain

the time when the plaintiff could <u>first</u> have maintained her action to a successful result." *Walden*

*v.*

*Jones*, 252 Ga. App. 692, 694 (2001) (statute of limitations began to run when plaintiff <u>was</u>

<u>initially disposed of his property</u>, not when defendant acquired possession of the property).

(Emphasis added).

Here, Creditor concedes that the cause of action for recovery of personal property and

damages for conversion accrued within one week of when Lynford Bentley passed away on

12/09/09 since the Cord was transferred within one week of his death. Doc. #54, Creditor's

Response to Debtor's Objection to Claim, page 9. Thus, the statute of limitations for conversion

ran on 12/09/2013 – 12/16/2013. To date, however, Creditor has not brought an action for

conversion. Therefore, Creditor's right for damages for conversion is time-barred and thus,

Creditor cannot establish the debt on the basis of conversion to seek a determination of its

nondischargeability.

        **ii.**        **Creditor's claim for criminal theft asserted against Ms. Bentley does not relate back to the original pleading.**

Assuming arguendo that Creditor properly stated a cause of action for criminal theft when

she initially sued Belinda Horne on December 6, 2013, Creditor's claim against Ms. Bentley was

not brought until May 16, 2016, or 2.5 years after the statute ran. Therefore, Creditor's claim

<u>against Ms. Bentley</u> does not relate back to date of the original complaint. (Emphasis added).

In order to invoke the relation-back provisions, Creditor must demonstrate that three

conditions are met:

> (1) the amendment adding the new defendant arose out of the same facts as the
> original complaint;

the new defendant had sufficient notice of the action [so that] he will not be prejudiced in maintaining
his defense on the merits; and

> (2) the new defendant knew or should have known that but for a mistake concerning
> his identity as a proper party, the action would have been brought against him.
> O.C.G.A. § 9-11-15.

Here, the original complaint was filed on December 6, 2013 against Belinda Horne for

criminal theft, fraudulent conversion, injunctive relief, writ of possession, and Creditor admitted

that it was filed three days before the statute ran. See Debtor's Exhibit 1 and Dkt. #54, Creditor's

Response to Debtor's Objection to Proof of Claim, page 9.

The amended complaint bringing Ms. Bentley as co-defendant was not filed until 2.5

years later, on May 16, 2016, after the statute of limitations on conversion ran. To overcome the

hurdle of not being able to prove any of the three conditions, Creditor simply joined Ms. Bentley

in all allegations against Ms. Horne claiming conspiracy between the two, despite clear evidence

in the record (depositions, affidavits, statements of undisputed facts, representations in open

court, etc.) that at all times Belinda Horne acted alone. Compare:

| Original Complaint – 12/6/13 (D's Exh.1) | Amended Complaint – 05/16/16 (D's Exh. 17) |
|---|---|
| ¶9:"After Bentley's death, Bentley's girlfriend, Defendant Horne took possession of the cars which secure the Promissory Notes, and all of Bentley's possessions including his money." | ¶11: "After Bentley's death, Bentley's girlfriend, Defendant Horne, and Bentley's mother, Kay Bentley, took possession of the cars which secure the Promissory Notes, and all of Bentley's possessions including his money." (Emphasis added). |
| ¶10: "Despite repeated requests, Defendant Horne has failed and refused to transfer the cars to Plaintiff Kolb or pay Plaintiff Kolb in accordance with the Promissory Notes." | ¶12: "Despite repeated requests, the Defendants have failed and refused to transfer the cars or assets of Bentley's Estate to Plaintiff Kolb or pay Plaintiff Kolb in accordance with the Promissory Notes." |

Notably, however, on December 2, 2016, Creditor filed a statement of undisputed facts in

Georgia in support of her motion for summary judgment admitting that Ms. Horne acted alone:

Creditor's Exhibit 61: ¶12: "After Bentley died, Horne took ownership of all of Bentley's worldly possessions. After Bentley's death, Horne took possession of and retained, distributed, or disposed of all of Bentley's possessions located in both homes including his personal paperwork, filing cabinets and the contents thereof, credit card statements, clothes, books, jewelry and all other personal effects. (Horne Depo., p. 114-17)."

> Creditor's Exhibit 61: ¶19: "After Bentley's death, Horne took possession of Bentley's Cord and during the pendency of this lawsuit transferred it to Bentley's mother, Catherine "Kay" Bentley in Florida where it was very recently sold. Specifically, what happened was the week after Bentley died Horne paid to have the Cord transported to her cousin, Patricia Bell's house ("Bell). (Horne Depo., p. 60: Q. So Nick's Towing is who you hired to go pick up the Cord after you paid [on or about December 15 or 16, 2009]? A. Yes. Q. and where did he transport the Cord to? A. Northside Drive [Bell's house]; Horne Depo., p. 19)."

Despite there being no evidence that Debtor had anything to do with the actions taken by

Belinda Horne following the death of her son and despite Creditor's judicial admissions that

Belinda Horne acted alone with respect to the above mentioned actions, Creditor's adversary

complaints allege conspiracy, partnership, and agency relationship between Belinda Horne and

Ms. Bentley:

> Adversary Complaints, ¶13: "Instead, the week after L. Bentley died, Belinda Horne, working in concert with Defendant Kay Bentley as Defendant Kay Bentley's agent, co-conspirator, and/or partner, secretly transported the Cord to her cousin, Patricia Bell's locked, secluded garage on Northside Drive in Atlanta. (Emphasis added).

Creditor's answers to interrogatories, however, indicate that the only basis she has for

alleging conspiracy is Defendant's admission during her deposition that Belinda Horne assisted

her in moving the Cord to Florida, which occurred on or around May 30, 2014, after the statute

of limitations ran:

> Debtor's Exhibit 25, Interrogatory #4: Please state all facts to support your allegations in the complaint that Belinda Horne was Defendant's agent, co-conspirator, and/or co-partner with respect to the transactions identified in the complaint.

Answer: … Therefore, without waiving said objection, the Plaintiff responds as such: in her deposition, the Defendant admitted that Belinda Horne assisted her in moving the Cord to Florida.

Debtor's Exhibit 25, Interrogatory #5: State all facts, information, or evidence Plaintiff has to support her allegation that Defendant, rather than Belinda Horne, secretly transported the Cord to Belinda Horne's cousin, Patricia Bell's locked, secluded garage on Northside Drive in Atlanta.

Answer: … It is currently unknown what involvement the pair had to move the Cord from Belinda Horne's house to Patricia Bell's house.

Finally, Creditor's trial testimony established that the Creditor's claim of conspiracy is rather

baseless and based on pure speculation:

Q. I would like to turn your attention to the claims of conspiracy that you're claiming in this case. So you allege conspiracy between Belinda Horn and Ms. Bentley. My understanding from your answers to the interrogatories in this case is that the sole basis of your conspiracy claim between Belinda Horn and Ms. Bentley is Ms. Horn's assistance with arranging for a transport company for Ms. Bentley four years after Belinda secured the cord. Is that correct?

A. I don't know if that's the sole thing. No. I'd have to look at all the evidence; and I i don't know if that's the sole thing is my answer.

Q. So then tell me the basis of your conspiracy claim.

A. Well, we have evidence of phone calls between the two during times that would be anticipated to the correct time if they were conspiring to take the cord. We have money disappearing from Kay Bentley's account and don't know where it went. It was probably turned into cash; but after that, we don't know where it went. It could have gone to pay Belinda Horn. That's a possibility. And, as i said before, there's a writ of possession that both Catherine Bentley and Belinda Horn had in their possession -- or should have had in their possession. Whether or not they've read it, i can't say; but they should have known that the court order was giving me possession of the cord and, instead, decided to take the cord out of Georgia and then take it to Sotheby's for sale without any proof of ownership for either of them. And they're both in full knowledge that the cord was partial collateral in this promissory note.

Q. Dr. Kolb, so you mentioned phone calls. Let's talk about the phone calls. During the first day of trial, your attorney has identified four phone calls for the records; all four from 2015. Are these the phone calls that you claim form the basis partially of your conspiracy claim?

A. I believe that they could be, yes.

Q. So would I be correct in stating that the conspiracy between Belinda Horn and Ms. Bentley started in 2015?

A. No, it -- Ms. -- Belinda Horn had to allow Ms. Bentley to take the cord out of her cousin's home. Now, we don't know for sure if other people were involved; and we have some suspicion that Kay Bentley did not act alone, but –

Q. So –

A. They would have to -- they would have to conspire together to move it, as far as I know, unless Kay Bentley somehow convinced Patricia Bell, who wasn't related to Ms. Bentley, to give her a car that was being stored in her house without Belinda's permission, which I think would be very unusual.

Q. No, but you are speculating right now, are you not?

I'm just saying -- I'm just saying that Belinda Horn would have to have told her cousin to allow Ms. Bentley to move the cord to Florida. So that implies a conspiracy, given that both of them knew that I had a writ of possession. Yes.

Q. Ms. Kolb, the -- we can agree that the cord was moved from Georgia to Florida in May of 2014, can we not?

…

Q. Okay. I would read for the record your judicial admission in the adversary complaint contained in paragraph 15. "within days after May 20, 2014, and with assistance of Belinda Horn, defendant Kay Bentley retained a transport company, traveled to Atlanta, took possession of the cord from Belinda horn and transported the cord to Florida." do you have any reason to doubt that that's the allegation you made in the adversary complaint in this case?

A. No. That would be correct. Thank you.

…

Q. So the phone calls that your attorney identified for the record in the first day of trial were all from 2015. So if the vehicle was moved in May of 2014 and the calls were made in 2015, that would have been after the cord already was moved, would it not?

A. That's correct.

Q. Can we agree that Ms. Bentley had no involvement, to your knowledge, with the cord until she moved the cord in May of 2014?

A. As far as I know.

Q. Now, we -- discussing the phone calls, you were not a witness to any of those phone calls. Is that correct?

A. That's correct.

Q. You've got no personal knowledge of the substance of those phone calls. Is that correct?

A. That's correct.

Q. The order of temporary writ of possession that you mentioned, that order you obtained in July of 2016, did you not?

A. Again, I would have to take a look at that to verify the date.

…

Q. You also alleged as a basis of your conspiracy claim that Ms. Horn -- Belinda Horn assisted Ms. Bentley in moving the vehicle from Georgia to Florida, correct?

A. Well, insofar -- the cord to be taken out of its locked location, yes.

Q. But you're aware that Ms. Bentley is 96 years old.

A. Well, that's why we think she had help moving it.

Q. So it wouldn't be unusual of that age to need any assistance -- some assistance in arranging for transport company to move the vehicle from one state to another. Would it be unusual?

A. No.

Creditor's Trial Testimony 290:20 - 296:17.

Since Creditor cannot establish any of the elements to trigger the relate back doctrine and her claim of conspiracy is based on pure speculation, the amendment adding Ms. Bentley as a co- defendant does not relate back to the date of the original complaint for purposes of the statute of limitations.

### iii.   Creditor cannot foreclose on a lien on personal property when the debt is time-barred.

With respect to personal property, "[f]oreclosure on a lien to secure a debt is time-barred when a claim on the underlying debt has become time-barred." *Hornsby v. Hunter*, 262 Ga. App. 598 (2003) (*citing Jones v. Wellon*, 237 Ga. App. 62, 514 S.E. 880 (GA App. 1999)).

Such a fundamental principle arises from the application of the statute of limitations for the separate instruments - a promissory note and a document creating a lien. *Alropa Corp. v. Goldstein*, 69 Ga. App. 168, 169-70 (Ga. App. 1943) (a promissory note and a mortgage are two separate and complementary instruments, such that the remedy on the note, which is barred by the statute of limitations, does not bar the remedy on the mortgage, which is not barred until the statute of limitations has run on that instrument). In Georgia, all instruments under seal are expressly excepted from the 6 year statute of limitations applicable to general contracts and have a 20 year statute of limitations. *Duke v. Story*, 116 Ga. 388, 390, 42 S.E. 722, 723 (Ga. 1902), *see also* O.C.G.A. § 9-3-23. Since the action to foreclose a mortgage is brought upon an instrument under seal, which acknowledges the existence of the debt and by reason of the seal, the six years' limitation applicable to all other contracts has no application to a mortgage in Georgia. *Id*. Therefore, as discussed in *Alropa Corp. v. Goldstein,* the note may be barred by the statute of limitations, but the enforcement of the mortgage may not be barred because of a much longer statute of limitations applicable to mortgages under seal in Georgia.

With respect to personal property, however, a security agreement, not a mortgage, creates a lien, and the statute of limitations on the note and the security agreement in Georgia is the same – 6 years. With respect to personal property, a security agreement creates a security interest

(lien). O.C.G.A. § 11-9-102(72). Section 11-1-201(3) provides: "Whether an agreement has legal consequences is determined by the provisions of this title, if applicable; otherwise by the law of contracts . . . ." Since Article 9 of UCC does not specify a statute of limitations for security agreement, general contractual statute of limitations period applies. "All actions upon simple contracts in writing shall be brought within six years after the same become due and payable." O.C.G.A.    § 9-3-24. Since, an action on the security agreement is subject to the 6 year statute of limitations applicable to contracts, it follows that foreclosure of a lien in this case is time-barred when the note is time-barred.

The analysis and application of this fundamental principle with respect to statute of limitations on separate instruments also finds its support in a recent decision from *In re Fisher*, 584 B.R. 185, 198 (Bankr. N.D. Ohio 2018) since Ohio has the same statute of limitations for enforcement of a note and a mortgage (6 years), just like Georgia has the same statute of limitations for enforcement of a note and a security agreement (6 years).

In this case, Creditor alleges that her security interest arises from a promissory note, and since the statute of limitations on the note ran on 2/12/14 as discussed above, so did the statute of limitation to foreclosure on a lien. Since Creditor cannot maintain a foreclosure action in Georgia on the collateral, Creditor cannot maintain an action for nondischargeability in bankruptcy.

**C.      Creditor failed to establish validity of the second promissory note.**

Creditor failed to establish the validity of the second promissory note since she presented

no independent testimony that the second promissory note was signed by Lynford Bentley,

deceased, or that the second promissory note was actually funded.

**1.      Creditor failed to establish authenticity of Lynford
Bentley's signature on the second promissory note.**

The signature is presumed to be authentic and authorized unless the action is to enforce liability of
the purported signer and the signer is dead. See *Lee v. Suntrust Bank,* 314 Ga. App. 63 (2012)
(citing OCGA § 11–3–308(a)( "…the burden of establishing the validity is on the person claiming
validity, but the signature is presumed to be authentic and authorized unless the action is to
enforce liability of the purported signer and the signer is dead…"). Creditor has the burden of
establishing the validity of the promissory notes. *Id.* Any testimony by Plaintiff that the deceased
endorsed the back of the subject check is inadmissible. See e.g., *Brodsky v.
Comm'r, 2001 Tax Ct. Memo LEXIS 274* (tax court rejected taxpayer's testimony concerning

numerous copies of front side of checks provided by taxpayer in that they were insufficient to

prove that they were negotiated).

Here, Creditor alleges that the second promissory note was signed by Lynford Bentley.

Since Lynford Bentley is deceased, there is no presumption that the signature on the note is

valid. Therefore, Creditor has to come forward with evidence, independent of her testimony, to

prove that Lynford Bentley signed the note. In this case, Creditor has not produced any such

evidence, therefore she failed to establish the validity of the second promissory note.

Even if a presumption that the signature on the note was valid applied, Debtor

demonstrated significant irregularities concerning the signature and execution of this promissory

note to shift the burden of proof of Creditor.

First, the signatures on the first and second promissory notes are completely different,

although Creditor alleges that Lynford Bentley signed both of the notes. (Creditor's Exhibits 14

& 15). Specifically, the signature on the first note spells out Bentley's name in its entirety,

whereas the signature on the second note does not. Creditor has not provided any evidence to

explain the differences in the signatures other than her testimony that she witnessed execution of

the second promissory note. (Creditor's Trial Testimony 238:16-239:8)

Second, the second promissory note does not contain the date of the notarial act, does not contain the required notarial certification pursuant to O.C.G.A. 45-17-8.1 that the document was executed in the presence of the notary, that the notary personally knew Lynford Bentley or confirmed his identity by verifying his identification before Lynford Bentley actually signed the note. (Plaintiff's Exhibit 15). The absence of the notarial certification is significant given that Creditor also contradicts herself by first claiming that the notary knew Lynford Bentley well, but then claiming that the notary had just met him. (Creditor's Trial Testimony 241:3-241:4).

**2.      The second promissory note fails for lack of consideration.**

Pursuant to OCGA §24-6-1, parol contemporaneous evidence is generally inadmissible to

contradict or vary the terms of a valid written instrument. Under §24-6-2, parol evidence is

admissible only to prove other portions thereof not inconsistent with the writing. Furthermore,

pursuant to §13-2-2, Rules for interpretation of contracts generally, parol evidence is

inadmissible to add to, take from, or vary a written contract and if the construction is doubtful,

the contract is interpreted most strongly against the party executing the instrument or undertaking

the obligation.

Furthermore, a copy of the front of the check is inadmissible without the corresponding

back. *United States v. Rogozinski*, 339 F. App'x 963, 968 (11th Cir. 2009); *Ruberto v.*

*Commissioner*, 774 F.2d. 61, 64, (2nd Cir. 1985) ("The tax court did not err in refusing to admit the photocopies of the cancelled checks, since problems in matching the copies of the backs of the checks with copies of the fronts made them somewhat suspect. Fed. R. Evid. 1003"), *United States v. Burston*, 608 F. Supp. 2d. 828, 831-32 (E.D. Mich. 2008) ("the Court also believes that the loss of the original puts the defendant at a disadvantage when it comes to confronting the signature on the back of the check. If the government argues that the defendant endorsed the name "Joseph Goode" on the back of the check, the defendant has no way of disputing that conclusion with forensic evidence. The counterpart (photocopy) is useless for testing of that sort."); see also *Hagen v. United States,* 485 Supp. 2d. 622, 627 (D. Md. 2007) ("Similarly, Condon's testimony regarding whether Hagen ever signed any Quantum checks is inadmissible because it relates to written instruments that have not been produced by either party.

Accordingly, pursuant to Fed. R. Evid. 1002, to prove the content of a writing, recording or photograph (i.e., Hagen's signature on the checks) requires the original writing, recording or photograph.")

Here, Creditor alleges that Mr. Bentley executed two promissory notes. The first promissory note in the amount of $50,000 was executed on May 16, 2006 listing 1961 Rolls Royce as collateral. The second promissory note in the amount of $50,000 was executed on May 26, 2006 listing 1930 L29 Cord as collateral. Although the two promissory notes are completely distinct, to wit: signed on different dates, secured by different collateral, containing different terms of repayment, etc. (Creditor's Trial Testimony 252:24-253:1-13) Creditor tendered only one consideration, $50,000, on May 26, 2006, alleging that the second promissory note was signed in further consideration of $50,000 tendered by Creditor under the first promissory note. (Creditor's Trial Testimony 241:11-241:25)

Furthermore, Creditor claims that the first note is only valid in terms of the collateral, whereas the second note is valid as to both the collateral and the terms the repayment.

(Creditor's Trial Testimony 253:20-253-23). However, neither of the promissory note(s) contains any such agreement. (Creditor's Trial Testimony 242:1-242:6) Creditor claims Lynford Bentley made 6 payments under the terms of the second promissory note, however, Creditor failed to provide proof of such payments, including their timing, and Creditor herself admitted that she could not determine when Lynford Bentley actually made those payments. (258:22- 259:6).

Creditor admitted that the second note was drafted by her attorney and that there is no separate instrument, contract or agreement securing payment of the second note. (264:15-264:20). Consequently, such a self-serving statement advanced by Creditor after death of Lynford Bentley is clearly barred by parol evidence rule, as well as it must be interpreted against Creditor, the drafter of the note.

Finally, Creditor failed to produce a copy of the cancelled check to prove that she paid Lynford Bentley $50,000 pursuant to the terms of any note. (Creditor's Trial Testimony 233:12-233:15) Instead, Creditor only provided the front of the check, a portion of which was redacted. (Creditor's Exhibit 16). Since Creditor failed to produce the front and back of the cancelled check, Creditor cannot prove that the money came out of her bank account or that Lynford Bentley endorsed and cashed said check.

Since the record is devoid of any evidence that the second promissory note was signed in further consideration of the first note, Creditor failed to establish her burden of proof.

**D.     Creditor could not have maintained an action for conversion or foreclosure with respect to the Cord on the basis of the May 24, 2016 promissory note because the note is unsecured.**

Even if the Creditor's claims were not barred by the statutes of limitations as discussed above, Creditor still could not have maintained an action for conversion or foreclosure because the promissory note dated May 24, 2016 is a general unsecured note.

First, to bring a claim for conversion, one must have an interest in the subject property. OCGA § 51-10-6. The elements of such a claim include the showing of a <u>valid security interest</u> in the debtor's property, disposition of that property, absence of the creditor's authorization for the disposition, and resulting damage to the creditor. (Emphasis added). *Marvin Nix Dev. Co.,* 692 S.E.2d 23, 25 (GA App. 2010). This is true even if the creditor is not suing on the underlying note. *Id.* Security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." O.C.G.A. § 11-1-201(37).

Likewise, section 44-14-550 of O.C.G.A. sets forth the exclusive procedure for foreclosure of liens on personal property and as part of that procedure a creditor must first establish that a <u>valid debt exists</u>. (Emphasis added). O.C.G.A. § 44-14-550 (4)-(5).

Pursuant to Article 9 of Georgia's Commercial Code, a creditor may only enforce a security interest in collateral against the debtor and third parties if three requirements are satisfied: (1) the debtor received value; (2) the debtor has rights in the collateral; and (3) "[t]he debtor has authenticated a security agreement that provides a description of the collateral[.]" O.C.G.A. § 11-9-203(b)(3)(A). A security agreement is defined as "an agreement which <u>creates or provides for a security interest.</u>" (Emphasis added). O.C.G.A. § 11-9-102(72). Being in derogation of the common law, lien laws and procedures must be strictly construed against the lien claimant and in favor of the debtor. *Dixie Concrete Svc. v. Life Ins. Co. of Ga.,* 331 S.E.2d 889 (Ga. App. 1985).

"Georgia law … does not require 'magic words' to create a valid security interest. A clause that specifically grants a party a security interest is not necessary. Rather, the Court must refer to the general law of contracts and determine whether the parties intended to create a security agreement." *In re Hollie,* 42 B.R. 111, 117 (Bankr. M.D. Ga. 1984). "A security agreement need not be in any particular form so long as it consists of a writing signed by the debtor that reasonably describes the collateral and includes language evidencing an intent to create a security interest." (Emphasis added). *Trust Company Bank v. Walker (In re Walker),* 35 B.R. 237, 239-240 (Bankr. N.D. Ga. 1983).

For example, in *In re Hollie*, the court determined that the contract at issue was a security agreement that created a security interest because it was titled "Security Agreement," it referred to the creditor as the "Secured Party" and it provided: "It is the purpose and intent of this instrument that . . . . this instrument shall secure payment of the note . . . ." *Id.*

Similarly, in *In re Flagler*, No. 07-50293-JDW, 2007 Bankr. LEXIS 2027 (Bankr. M.D. Ga. June 8, 2007), the court determined that a note signed by a debtor created a security interest because a debtor signed a title application with a detailed description of the collateral that listed a creditor as a lienholder as well as the debtor testified that he understood that he was giving the creditor a lien on the truck until the note was satisfied and that the lien evidenced a security interest.

By contrast, in *Simmons v. Brown (In re Brown),* No. 14-72940-BEM, 2015 Bankr. LEXIS 1605 (Bankr. N.D. Ga. Apr. 28, 2015), the court concluded that the documents presented by the parties (a letter, bill of sale, and title) did not show an intent to create a security interest in a vehicle when the letter signed by a debtor (although it described the collateral in detail, including year, make, model, and VIN) did not state that the car was given as security for the

debt, nor did it authorize the creditor to repossess or sell the car in the event of a default by the

debtor. Also, nothing in the bill of sale or title evidenced an intent to create a security interest as

both documents were in Debtor's name, and the title showed no liens on the car. The only

evidence of intent to create a security interest came from the creditor's disputed testimony that

the debtor gave him the title, the bill of sale, and the Letter to make him feel secure.

The same conclusion was reached in *First Nat'l Bank v. Alba (In re Alba)*, 429 B.R. 353 (Bankr. N.D. Ga. 2008) since there was no signed "security agreement," and a creditor was not referred to as the "secured party." The only possible indication of the parties' intent relevant to the creditor's alleged security interest was in the box titled "SECURITY" and the box stated that the loan was "separately secured by (describe separate document by type and date)." The court concluded that such language demonstrated the creditor's intention to have separate documents creating security interests in debtors' properties. Also, the box stated that it was "for your internal use. Failure to list a separate security document does not mean that the agreement will not secure this note." The court concluded that such language did not indicate an agreement between the creditor and the debtors to grant a security interest in the debtors' personal property.

The second promissory note (Plaintiff's Exhibit 15) is completely unlike *In re Hollie* and

*In re Flagler*, where the court found the security interest was intended, and very similar to *In re*

*Brown* and *In re Alba*, where the court found the security interest was not intended. The subject

note was titled "promissory note" (not a security agreement, or secured promissory note), it

referred to Creditor as a "holder of the note" (not a "secured creditor") and it did not include any

language granting a security interest in the Cord or provided that its purpose and intent were to

secure a note.

Also, just like the writings in *In re Brown* and in *In re Alba*, the subject note did not

contain any language of intent to create a security interest in the Cord. Although the subject note

listed the Cord as collateral for the loan and required the maker to surrender the title to the Cord

until the loan was paid off, this was a futile provision since the Cord had no title and the maker

knew that he had no title to the Cord, as well as *In re Brown*, the court found that having a

description of collateral and surrendering a title to a creditor is not sufficient to show intent to

create a security interest.

Additionally, like in *In re Brown* and in *In re Alba,* the note contained no provisions indicating
what would happen to the Cord upon default or that Creditor would have a remedy of foreclosure
or repossession available to Creditor upon default. Notably, just like in *In re Alba*, the promissory
note at issue specifically stated at the bottom of the first page that

"[h]older shall thereupon be entitled to exercise immediately any and all right and
remedies for the collection of such indebtedness available to Holder at law [not secured
party], in equity or by virtue of any instrument, contract or agreement securing repayment
thereof." (Emphasis added).

Such language clearly evidences the maker's intent only to give Creditor remedies

available to a "holder at law," rather remedies available to a secured creditor, unless there is a

separate security agreement, and no agreement securing repayment of the loan was attached to

the promissory note.

Finally, it is important to note that although Creditor is listed on the policy insuring the

Cord as a "lienholder/loss payee," the notes from Hagerty insurance clearly demonstrate that

Lynford Bentley simply intended to obtain insurance coverage on the Cord in the amount of the

loan ($50,000) and to add Creditor as a loss payee to obtain the loan. Mr. Bentley made it very

clear to the insurance agent that Dr. Kolb had no ownership interest in the Cord and was only a

holder of the note with the Cord as collateral and that he needed to add her as a loss payee [not a

lienholder] to honor the note in the event of total loss. (Debtor's Exhibit 31).

Finally, under the terms of the policy, being a loss payee only gives one a right to the

insurance proceeds in the event of loss and it does not give the loss payee a right to foreclosure

on the insured property:

**Loss Payable Clause**. **Loss Payee**: Loss or damage under this policy shall be paid, as interest may appear, to you and the loss payee shown in the Declarations or in this endorsement. This insurance with respect to the interest of the loss payee, shall not become invalid because of your fraudulent acts or omissions unless the loss results from your conversion, secretion or embezzlement of "your covered auto." However, we reserve the right to cancel the policy as permitted by policy terms and the cancellation shall terminate this agreement as to the loss payee's interest. We will give the same advance notice of cancellation to the loss payee as we give to the named insured shown in the Declarations. When we pay the loss payee we shall, to the extent of payment, be subrogated to the loss payee's rights of recovery. (Debtor's Exhibit 31).

In conclusion, the language of the subject promissory note along with the notes from

Hagerty insurance do not evidence an intent by the maker of the note, Lynford Bentley, to grant

a security interest in the Cord to Creditor. At the very most, Creditor was intended to be a loss

payee to share in the insurance proceeds in the event of the loss, which did not transform

Creditor into a secured creditor. Therefore, the note is a general unsecured note.

> **E.     Assuming there is a valid debt, Creditor cannot establish that the liability for the debt falls under 523(a)(2)(a), section 523(a)(4), and section 523(a)(6).**
>
>> **1.     Proof of intent to defraud, to deceive, or injure is determinative for all three sections, and Ms. Bentley could not have formed this specific intent due to her diminished mental capacity, which she had at least since 2014.**

Proof of intent to defraud, to deceive, or injure is determinative for all three sections, and

Ms. Bentley could not have formed this specific intent due to her diminished mental capacity,

which she had at least since 2014. *In re Colvin,* 117 B. R. 484, 478 (Bankr. E.D. Mo. 1990)

(petition under §523(a)(2) was denied when debtor lacked the requisite mental intent due to her diminished mental capacity.)

On May 16, 2018, Ms. Bentley was declared to be subject to total legal disability by a court appointed panel of three licensed experts (a medical doctor, a doctor of psychology, and a gerontologist) as confirmed by the Florida state court, the court of exclusive jurisdiction for adjudicating incapacity matters, in the Order Determining Total Incapacity of Debtor (Debtor's Exhibit 22):

1. The Ward suffers from Microvascular Ischemia **diagnosed in an MRI in 2014** which caused her vascular dementia, paranoia, hallucinations, memory loss, and confusion. Because of her memory loss and impaired concentration, the Ward is unable to understand conclusions, engage in problem solving and cannot give informed consent. The Ward's thought processes are tangential always returning to the premature deaths of her only children. The Ward's mood is labile crying to happy in the same sentence. As a result of the Ward's paranoia, the Ward has lost several friends by claiming that they have stolen from her. The Ward also has chronic kidney disease, congestive heart failure, angina, anxiety, depression and a history of transient ischemic attacks (TIA). The Ward further needs assistance with the activities of daily living (ADL). **The aforesaid conditions are progressive and irreversible**.

2. As a result of the aforesaid mental and physical conditions, the Court finds that the Ward totally lacks capacity to make informed decisions about care and treatment or to meet the essential requirements for the Ward's physical or mental health or safety and is a danger to herself.

Notably, at trial, Creditor, who is herself a medical doctor, further confirmed that vascular dementia can develop over night following an ischemic event:

Q.    You are a medical doctor, are you not?
A.    Yes.
Q.    You are aware that dementia does not develop overnight, are you not?
A.  Well, actually, sometimes you can develop overnight. So it can develop very quickly if there is an ischemic event. In fact, it would -- it would be more likely to be quickly if it was an ischemic event.
Q.  And you are well aware that Ms. Bentley had an MRI done in 2014 that showed that she had ischemic event on that MRI. Are you not aware of that?
A.  I have seen that, but -- and it -- microvascular ischemia on an MRI is not diagnostic for a stroke or dementia. Dementia is a clinical diagnosis.
        Creditor's Trial Testimony 311:15 – 312:05.

Although Ms. Bentley had lucid moments, her clinical records clearly show persisted symptoms of memory loss, paranoia that someone is stealing her property, and confusion since at least 2014, when she had an MRI which revealed Microvascular Ischemia. See Debtor's Exhibit 18:

> 01/31/14: "Patient called stating that awhile ago you had prescribed alprazolam 0.5 mg for her. Patient seems to feel it was when her boys passed. Something for anxiety. Patient states she had gone done to Venice this past weekend. When she had gotten home she had noticed that some things were missing from her condo."

10/22/14: "Patient called stating she is down to 2 pills. Patient states her bottle are disappearing .. Patient states when she goes out they rob her apartment. Patient states she has had $5000 worth of jewelry stolen. Patient states the police are involved. Patient states she does not know what to do."

> 07/23/15: "She has mold in her condo. So this is causing her some stress. She thinks that someone from her condo comes into her house ans steals her clothes and such. and they disable her alarm."

> 03/27/17: "Patient states someone had gone into her home and took her purse. Patient states she does not have a drivers license and is unable to drive without it. Patient states she had the Police at her apartment yesterday. They looked throughout her apartment for her purse but could not find it. Patient thanks you for being so kind."

> 04/05/17: "Patient called crying. Patient stales someone has been in her condo and stole all her medications and $400."

Since proof of specific intent to defraud, deceive or injure is required to except a debt from discharge under sections 523(a)(2)(a), 523(a)(4), and 523(a)(6), and Ms. Bentley had diminished mental capacity since at least 2014 when she was first diagnosed with dementia, Creditor cannot prove Ms. Bentley's state of mind as to a specific action, let alone the requisite actual intent to defraud or to injure Creditor as a matter of law with respect to her allegations in the complaint.

### 2.    11 U.S.C. §523(a)(2)(A) – Fraud

Courts should narrowly construe exceptions to discharge against the creditor and in favor of the debtor. *See St. Laurent v. Ambrose (In re St. Laurent),* 991 F.2d 672, 680 (11th Cir.1993).

A creditor seeking to establish a non-dischargeable fraud debt under 11 U.S.C. § 523(a)(2)(A)

must prove the elements of common law fraud. *Field v. Mans*, 516 U.S. 59, 68-69 (1995).

Specifically, Plaintiff must establish that (1) Defendant made a false representation with the

purpose and intent of deceiving Plaintiff; (2) Plaintiff relied upon the representation; (3)

Plaintiff's reliance on the representation was justified; and (4) Plaintiff sustained a loss as a

result of the representation. *In re Johannessen,* 76 F.3d 347, 350 (11th Cir.1996). Additionally,

plaintiff must prove that the debtor's conduct involved <u>actual fraud</u> — either moral turpitude or

intentional wrong on the debtor's part to prevail in a Section 523(a)(2)(A) action. *Husky Int'l Elecs.,
Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016). (Emphasis added). Finally, Plaintiff must prove that
Debtor <u>obtained the debt </u>by actual fraud to except it from discharge. *Id.* at 1589. Plaintiff
must prove each element by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S.

279, 291 (1991).

Section 523(a)(2)(A) is obviously inapplicable to the facts alleged or proved. Specifically,

Creditor admitted that conversion of the Cord occurred within a week of Lynford Bentley's death

on December 9, 2009 when Belinda Horne took possession of it and Creditor has no evidence to

show that Ms. Bentley had any involvement with the Cord until she took possession of it from

Belinda Horne on May 30, 2014 as discussed above.

Furthermore, since the Cord was converted in December of 2009, over four years prior to

Ms. Bentley taking possession of it on May 30, 2014, Creditor was not able to identify a single

material misrepresentation that Ms. Bentley made in order to convert property in December of

2009, as well as there are no allegations at all to meet the element of justifiable reliance on the

part of Creditor:

> <u>Debtor's Exhibit 25, Interrogatory #3:</u> Please state the factual basis for your allegations in
> the complaint that Defendant acted under false pretenses, made materially false

representations and/or actual fraud in order to convert property and identify each and every materially false representation, false pretense, or an act of actual fraud you allege was made directly by Defendant, rather than Belinda Horne, to convert property, and with respect to each such act state when it was made, to whom it was made, and the substance of each act or misrepresentation.

Answer: … Defendant materially misrepresented or omitted the following facts in conjunction therewith: 1) The Defendant claims that she had an ownership interest in the Cord at the time Lynford Bentley died pursuant to the Defendant's divorce decree…, 2) The Defendant claims that Lynford Bentley was temporarily holding onto the Cord for her, though there is no evidence of such other than the Defendant's self-serving testimony, 3) The Defendant refused in her deposition to disclose the location of the Cord or details about the Cord's transfer to Florida, including who transported the Cord, when it was transported, and where it was being stored, 4) On or about October 5, 2015, the Defendant refused to disclosure to the Plaintiff and Deputy Miller that the Cord had been sold at auction, and where the Cord was located after it was purportedly removed from All Aboard Storage on June 27, 2015, 5) Defendant filed to notify the Plaintiff that she moved the Cord from All Aboard Storage on or about June 27, 2015 even though she knew that the Cord was the subject of litigation in Georgia based on her deposition taken on January 8, 2015.

Additionally, Creditor failed to prove several of her allegations in the complaint as well as failed

to demonstrate that Debtor's actions were taken with an actual intent to defraud creditor:

1) *¶12 - Despite repeated requests, demands, and court orders, Defendant Kay Bentley has failed and refused to transfer the cars or assets of L. Bentley's Estate to Plaintiff Dr. Kolb or to pay Plaintiff Dr. Kolb in accordance with the Promissory Notes.*

At trial, however, Creditor denied making a statement that she made multiple demands to

Debtor at all. Creditor's Trial Testimony 288:02 – 288:08:

> Q. You also alleged to this court that you made repeated demands, requests to Ms. Bentley to turn the vehicles over to you. Isn't it true that you, in fact, never demanded Ms. Bentley to return the vehicle to you -- the cord?
> A. Well, I never -- I never stated that I made multiple demands to Catherine Bentley at all.

2) *¶13 - Instead, the week after L. Bentley died, Belinda Horne, working in concert with Defendant Kay Bentley as Defendant Kay Bentley's agent, co-conspirator, and/or partner, secretly transported the Cord to her cousin, Patricia Bell's locked, secluded garage on Northside Drive in Atlanta.*

As discussed above, Creditor's trial testimony established that Creditor's claim of conspiracy

is based on pure speculation, as well as Creditor admitted that Debtor had no involvement in

moving the Cord to Patcicia Bell's garage:

> Creditor's Exhibit 61: ¶19: "After Bentley's death, Horne took possession of
> Bentley's Cord and during the pendency of this lawsuit transferred it to Bentley's
> mother, Catherine "Kay" Bentley in Florida where it was very recently sold.
> Specifically, what happened was the week after Bentley died Horne paid to have
> the Cord transported to her cousin, Patricia Bell's house ("Bell). (Horne Depo., p.
> 60: Q. So Nick's Towing is who you hired to go pick up the Cord after you paid
> [on or about December 15 or 16, 2009]? A. Yes. Q. and where did he transport the
> Cord to? A. Northside Drive [Bell's house]; Horne Depo., p. 19)."

Debtor's Exhibit 25, Interrogatory #5: State all facts, information, or evidence Plaintiff has to
support her allegation that Defendant, rather than Belinda Horne, secretly transported the Cord to
Belinda Horne's cousin, Patricia Bell's locked, secluded garage on Northside Drive in Atlanta.
> Answer: … It is currently unknown what involvement the pair had to move the
> Cord from Belinda Horne's house to Patricia Bell's house.

3)  *¶14 - After Plaintiff Dr. Kolb served Belinda Horne with a Request to Inspect the Cord*
    *during the pendency of another civil action, on May 20, 2014, Belinda Horne*
    *immediately contacted Defendant Kay Bentley and advised Defendant Kay Bentley to*
    *come and take the car because the car was at risk of being taken by Plaintiff Dr. Kolb*
    *pursuant to the Request to Inspect.*

At trial, Creditor failed to establish that Belinda Horne immediately contacted Debtor

following a Request to Inspect, as well as she testified that she had no personal knowledge of the

substance of any phone called Debtor had with Belinda Horne:

> Q. Now, we -- discussing the phone calls, you were not a witness to any of those
>    phone calls. Is that correct?
> A. That's correct.
> Q. You've got no personal knowledge of the substance of those phone calls. Is that
>    correct?
> A. That's correct.
>    Creditor's Trial Testimony 295:04 – 295:10

4)  *¶15 - Within days after May 20, 2014, and with the assistance of Belinda Horne,*
    *Defendant Kay Bentley retained a transport company, traveled to Atlanta, took*
    *possession of the Cord from Belinda Horne, and transported the Cord to Florida where*

*Defendant Kay Bentley stored it in a locked garage at All Aboard Storage in Daytona*
*Beach, Florida beginning on May 30, 2014.*

At trial, Creditor agreed that it was not unusual for a 96 year old Debtor to need assistance to

move a vehicle from one state to another:

> Q.  But you're aware that Ms. Bentley is 96 years old.
> A.  Well, that's why we think she had help moving it.
> Q.  So it wouldn't be unusual of that age to need any assistance -- some assistance in
>     arranging for transport company to move the vehicle from one state to another.
>     Would it be unusual?
> A.  No.

Creditor's Trial Testimony 296:09 – 296:17

Further, Creditor failed to establish that Debtor hit the Cord at All Aboard Storage. In

fact, Ms. Bentley testified at deposition that she had to store it in the storage due to its

exceptional length:

> A.  Since the car was exceptionally long - I don't know whether you~re familiar
>     with it or not - it had to be extra, extra long -- or a deep storage. So this place
>     had to be 20 feet or maybe a little longer. Creditor's Exhibit 49, Deposition of
>     Debtor, 18:01 – 18:04.

5)  *¶16 - Defendant Kay Bentley participated in the move of the Cord to All Aboard Storage
    in Florida without informing Plaintiff Dr. Kolb about the move, without posting a bond in
    violation of O.C.G.A. § 44-14-234(3), and with full knowledge that the Cord was the
    subject of litigation and the Plaintiff Dr. Kolb's claim to it.*

At trial, Creditor presented no evidence to prove that Debtor moved the Cord with full

knowledge that it was subject of litigation and Creditor's claim to it. In fact, Ms. Bentley

testified at deposition that she moved the Cord to Florida because she was the rightful owner of

the Cord:

> Q.  So what prompted you to go up there seven months ago and pick up the car?
> A.  Well, I knew something was going to happen. And knowing it was my car, that's
>     what prompted me. Creditor's Exhibit 49, Deposition of Debtor, 09:12 – 09:15.

6)  *¶28 - Adv. #2 - On July 20, 2015, that Georgia court entered a writ of possession relating
    to the Cord awarding Plaintiff interlocutory possession of the Cord <u>to the detriment of
    Defendant, which was also recorded at Book #7143, page 4015 on that same day.</u>*

At trial, Creditor admitted that she never had a writ of possession against Debtor at the time

the Cord was sold at auction:

> Q.  At the time that the cord was sold in September of 2015, you did not have any
>     order that directed Ms. Bentley -- not Belinda Horn, but Ms. Bentley -- to turn
>     possession of the Cord to you, did you?
> A.     No…

Creditor's Trial Testimony 295:01 – 295:06.

7) ¶20 - *Defendant Kay Bentley did not have any right to possess the Cord and did not have any right to sell the Cord. Defendant Kay Bentley took these actions above maliciously, willfully, and with full knowledge of her conduct and that her conduct was wrongful, improper, in violation of court orders, and would be harmful to property and rights of Plaintiff Dr. Kolb.*

One cannot maliciously, willfully and knowingly violate a court order when he/she is not subject to the order or even on notice of it. Here, Creditor admitted at trial that she had no orders against Debtor prior to the Cord's sale. Creditor also failed to establish that Debtor was on notice of the orders Creditor obtained against Belinda Horne. In fact, record evidence establishes that Creditor never put Debtor on notice of any such orders.

Additionally, Creditor failed to present any evidence to show that Ms. Bentley had actual intent to defraud Creditor when she consigned the Cord to an auction and had it sold. In fact, as it turned out, the auction company pressured Ms. Bentley to sell the Cord. See Debtor's Exhibit 32 containing internal e-mails from the auction company dated June 25, 2015 evidencing the pressure they were exerting on Debtor to sell the Cord:

> Kelli Bishop to Donny Gould: "I spoke with Kay yesterday and she said that you called her the night before. She mentioned that you weren't sure about the estate on her car and she is concerned that you were confusing her car with another car. She's still not comfortable with the $135K reserve. Kay now mentioned to me about 3 times that there is a guy in California that was interested in the car before she met you. You estimated her car to be $175,000-$225,000. She wants to talk to you again and said maybe when you get back we can get this all straightened out and then she'll send back the paperwork. However, I called Reliable again this morning to see if they have an approximate pick up date. I tried to put some more

> heat on them since I found out yesterday that Jul 10th is AF15 catalog deadline and we still need to get the car running for photos. I was told that the car should be picked up by Sunday…fingers crossed!!! I'm just hoping that Reliable will finally pick up the car and Kay doesn't stop them because she hasn't talked to you. Just wanted to keep you updated." Kelli Bishop, Executive Assistant.

> Donny Gould's Reply: "Send me her number please." DG

> Kelly Bishop to Donny Gould: "I know you don't want to call her but she doesn't want to send back the paperwork until she talks to you. I keep telling her that we will do everything we can to get her to the most money for her car. She's just afraid she will only get $135k less all the costs involved. I have been talking to Reliable every day to have the car picked up. Still don't know when it's going to happen. Kelli Bishop, Executive Assistant

8) *¶22 - According to Defendant Kay Bentley, the funds from the sale of the Cord have been paid to a financial institution that has a mortgage on her home. Upon information and believe, Defendant Kay Bentley transferred those funds in order to hinder, delay, and defraud Plaintiff Dr. Kolb.*

At the time Debtor paid off her mortgage, Debtor was not on notice of any orders Creditor obtained against Belinda Horne. Record evidence establishes that Creditor never put Debtor on notice of any such orders.

9) ¶34 - Defendant Kay Bentley has failed to return the funds she took from the sale of the Cord.

At trial, Creditor testimony that she never demanded Debtor to return the funds:

> Q.    You've never demanded her to return the funds, did you?
> A.    I'd have to consult with my attorneys about any demands made; but not to my knowledge.
> Creditor's Trial Testimony 299:14 – 299:17

### 3.    11 U.S.C. §523(a)(4) – Larceny

To demonstrate a claim for larceny under § 523(a)(4), Plaintiff must prove that the debt at issue arose from the "fraudulent taking and carrying away of property of another with intent to convert such property to his use without consent of another." *In re Smith*, 381 B.R. 398 (Bank. M.D. Fla. 2007). Proof of larceny within the meaning of this exception requires proof of fraudulent intent or deceit by the debtor. *In re Miceli*, 237 B.R. 510, 516-17 (Bankr. M.D. Fla. 1999). As discussed above, Ms. Bentley's testimony makes it clear that she believed the Cord belonged to her when she took possession of the Cord in 2014 and sold it.

### 4.    11 U.S.C. §523(a)(6) – Willful and Malicious Injury

Actions under §523(a)(6) include claims based upon the conversion of property. For a debt based on conversion to be nondischargeable under §523(a)(6), the injury must be both willful and malicious. With respect to the "willful" requirement, it is now well-established that a plaintiff must show that the debtor intended the injury, not merely that he intended the act which resulted in the injury. In other words, a deliberate or intentional injury is required under §523(a)(6). *In re Luca*, 422 B.R. 772, 775 (Bankr. M.D. Fla. 2010)(citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998)).

With respect to the "malicious" requirement, a plaintiff must show that the injury was "wrongful and without just cause or excessive even in the absence of personal hatred,

spite or will-will.*" In re Luca*, 422 B.R. at 775-76 (quoting *In re Walker*, 48 F.3d 1161, 1164 (11th Cir. 1995)). It is the knowledge or consciousness of wrongdoing that is critical for purposes of determining nondischargeability under §523(a)(6). *In re Luca*, 422 B.R. at 776 (citing *In re McClung*, 335 B.R. 466, 475 (Bankr. M.D. Fla. 2005)).

Here, Creditor failed to demonstrate Debtor intended to injure Creditor and that her actions were wrongful and without just cause as discussed above.

## III.     DENIAL OF DISCHARGE UNDER SECTION 727(a)(2)(A)

Objections to a debtor's discharge should be construed liberally in favor of the debtor and strictly against the objecting party. *In re Harmon*, 324 B.R. 383, 389 (Bankr. M.D. Fla.

2005)(citing *In re Ingalls*, 297 B.R. 543, 547 (Bankr. CD. Ill. 2003)). Further, Rule 4005 of the

Fed. R. Bankr. P. provides that "[a]t the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection."

Creditor and Trustee cannot prevail under §727(a)(2)(A) for two reasons: 1) Debtor did not transfer, remove, destroy, mutilate, or conceal, or has permitted to be transferred, removed, destroyed, mutilated, or concealed any property within a year of filing bankruptcy, 2) Plaintiffs cannot prove the actual fraudulent intent under the fact of this case in light of Debtor's diminished mental capacity discussed above.

## Ms. Bentley did not transfer any property within a year of bankruptcy.

Plaintiff alleges in the complaint that Debtor transferred some property that belonged to the estate within one year preceding bankruptcy, which is one of the key requirements to prevail under § 727(a)(2). Other than the verbatim recitation of the statutory language of section 727(a)(2), there are no allegations in the complaint as to what property was transferred, when or to whom the property was transferred.

Discovery revealed that Plaintiffs have no knowledge of any transfer that was made by Ms. Bentley within one year of bankruptcy:

**Debtor's Exhibit 25, Interrogatory No. 2**: Please identify the exact personal property that Plaintiff claims was property of the estate that Defendant allegedly transferred within one year of the filing of the bankruptcy petition, when and to whom such personal property was transferred to, and state all facts to support Plaintiff's claim that such property was transferred by Defendant with intent to hinder, delay, or defraud Plaintiff.

**Answer**: Debtor's disposition of certain of the proceeds from the sale of the Cord are known (e.g., investment into homestead by paying off mortgage loan), but any use any other of those proceeds is not known at this time.

**Debtor's Exhibit 26, Request for Admissions No. 6**: Admit that the alleged transfer of the subject Cord did not occur within one year of the filing of the bankruptcy petition by Defendant.

**Response**: Admitted.

**Debtor's Exhibit 26, Request for Admissions No. 7**: Admit that the alleged transfer of the proceeds from sale of the subject Cord did not occur within one year of the filing of the bankruptcy petition by Defendant.

**Response**: Admitted.

**Debtor's Exhibit 26, Request for Admissions No. 8**: Admit that Plaintiff has no information to show that Defendant transferred any property that was property of the estate within one year of the filing of the bankruptcy petition.

**Response**: Admitted.

Consequently, Creditor cannot prevail under section 727(a)(2)(A).

## IV.    FAILURE TO STATE CAUSE OF ACTION FOR UNJUST ENRICHMENT

When one party has conferred a valuable benefit on another in the absence of a contract, either express or implied, the doctrine of unjust enrichment creates a fictional contract, sometimes called a quasi-contract or contract implied in law, to the extent necessary to avoid clear injustice. *Adventist Health Sys./Sunbelt Inc. v. Med. Sav. Ins. Co.*, No. 6:03-cv-1121-Orl- 19krs, 2004 U.S. Dist. LEXIS 30976 (M.D. Fla. Mar. 5, 2004). Under Florida law, "[a] claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012).

Creditor cannot state the claim for unjust enrichment since Creditor did not confer

any benefit on Debtor.

## V.    CONSTRUCTIVE TRUST AND EQUITABLE LIEN

Creditor asserts that she is entitled to a constructive trust and/or an equitable lien

against the homestead property because the home was purchased with funds the Debtor

fraudulently obtained from Creditor. A constructive trust and equitable lien are remedial

devices to prevent unjust enrichment. *White v. Weatherford (In re Abrass)*, 268 B.R. 665,

680 (Bankr. M.D. Fla.

2001) (citations omitted). Equitable liens are available to remedy those situations where there is no adequate remedy at law. *In re Collman & Karsky Architects, Inc*., 460 B.R. 810, 813 (Bankr. M.D. Fla. 2011). Here, Creditor is not entitled to equitable remedies since she has an adequate remedy at law as well as Creditor cannot state a claim for an equitable lien or constructive trust.

> **A.    The court has no jurisdiction to consider Creditor's claim seeking an equitable lien against the homestead considering that Creditor failed to object to exemption.**

Where creditor fails to object to exemptions claimed by debtor within 30-day period required under Bankruptcy Rule 4003(b), property claimed as exempt on debtor's list of exemptions is exempt as to that creditor. *In re Cochrane*, 178 B.R. 1011, 1016 (Bankr. D. Minn. ~~1995)~~ 1995) (citing Taylor v. Freeland & Kronz, 503 U.S. 638, (1992)). The court has no jurisdiction to consider Creditor's claim seeking an equitable lien or constructive trust against the homestead considering that Creditor failed to object to exemption. See Memorandum of Law contained in Section IC.

> **B.    Creditor has an adequate remedy at law.**

At trial, Creditor admitted that she was not without remedy at law at least in December of 2016 since the collateral allegedly securing the first promissory note was still available to satisfy the alleged debt:

> Q.  So as of 2016, you had ability to take possession of one of the collaterals that you claim secure your notes.
> A.    Yes.
> Q.    But you haven't done that.
> A.  Well, it's stored in her home. So it's not like it's on the street and we can send somebody to repossess it.
> Q.  So it -- okay. So you are aware that there is the judicial process available to you for exactly -- for exactly those type of situations. When you can't simply take repossession, you can foreclose on ot and still take possession of the vehicle. Are you not aware of that?
> A.  I'm aware of that, but we're involved in litigation and I see no reason to take possession of it at this time. It's a matter for litigation.

> Creditor's Trial Testimony 260:09 – 260:25.

Additionally, the auction company that sold the Cord, Sotheby's auction, purchased a title bond insurance that is available to satisfy the alleged debt. Creditor's Adversary Complaint ¶34, Debtor's Exhibit 32.

Consequently, Creditor is not without a remedy at law to satisfy the alleged debt as she

can pursue the sale of Rolls Royce and the title bond insurance.

### C. Creditor is not entitled to constructive trust.

Florida courts have held that, to demonstrate a constructive trust, a plaintiff must prove four elements by clear and convincing evidence: 1) a promise, express or implied; 2) a transfer of property and reliance thereon; 3) a confidential relationship; and, 4) unjust enrichment. *White v. Weatherford (In re Abrass)*, 268 B.R. 665 (Bankr. M.D. Fla. 2001) (citing *Provence v. Palm Beach Taverns Inc.*, 676 So. 2d 1022, 1025 (Fla. 4th Dist. Ct. App. 1996)). A constructive trust arises at the time of the fraud. *Id*.

Here, Creditor cannot prove any of the elements for imposition of a constructive trust. First, no confidential relationship existed between the Debtor and Creditor. To demonstrate a confidential relation, courts should examine whether "influence has been acquired and abused" and whether "confidence has been reposed and betrayed." *Quinn v. Phipps*, 93 Fla. 805, 113 So. 419, 422 (1927). In this case, Ms. Bentley had no contact with Creditor at all to establish any confidential relationship. Also, Ms. Bentley made no promises to Creditor and Creditor did not transfer any property to Ms. Bentley in reliance of any promises. Accordingly, Creditor is not entitled to a constructive trust against the Debtor's home.

### D. Creditor is not entitled to equitable lien.

The "prevailing view in Florida is that equitable liens may be founded upon two bases: (1) a written contract that indicates an intention to charge a particular property with a debt or obligation; or, (2) a declaration by a court out of general considerations of right or justice as applied to the particular circumstances of a case." *In re Tsiolas*, 236 B.R. 85, 88 (Bankr. M.D.Fla.1999) (citing *Jones v. Carpenter*, 90 Fla. 407, 413-14, 106 So. 127 (1925); *Ross v. Gerung*, 69 So. 2d 650, 652 (Fla. 1954)). Courts must look to applicable state law when determining whether an equitable lien should be imposed. *Tsiolas*, 236 B.R. at 88.

Courts imposing equitable liens on homestead property require a very high standard. *In re Diamond*, 196 B.R. 635, 639 (Bankr.S.D.Fla.1996) ("When homestead rights are in jeopardy, Florida law requires far more than a mere equitable basis for the imposition of an equitable lien because the homestead right is a constitutional, fundamental right."). Typically, an equitable lien is imposed upon homestead property only if the misappropriated funds are traced directly into the homestead and the misappropriation occurred due to fraud and reprehensible conduct. *Diamond*, 196 B.R. at 639. The heightened standards applied by the Bankruptcy Courts for Florida's Southern District are consistent with the recent Florida Supreme Court case of *Havoco of America, Ltd. v. Hill*, 790 So. 2d 1018 (Fla. 2001), in which the Court addressed the limits of the exceptions to Florida's homestead exemption. In *Havoco*, The Florida Supreme Court held that equitable principles could be invoked "to reach beyond the literal language of [Florida's homestead] exceptions only where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead." *Id.*

Applying this standard to the facts in this case, Creditor is not entitled to an equitable lien because Debtor did not obtain the funds through fraudulent and egregious conduct as discussed above.

### E.      Creditor failed to mitigate her damages

It is undisputed that Creditor did not bring any action against Lynford Bentley during almost 3 years of his life following his alleged default on the note(s). After his death, Creditor waited another 4 years to sue Belinda Horne on the eve of the running of the statute of limitations while on notice that Debtor was the true party in interest as the sole heir of Lynford Bentley. Then, Creditor waited another almost three years to sue Debtor. Even through Creditor at all times had an available collateral to repossess and sell to satisfy the alleged debt, she made a conscious decision not to do so thereby allowing the interest rate of 18% to unnecessarily accrue. Consequently, Creditor failed to mitigate her own damages by purposefully delaying bringing an action to enforce the alleged debt and failing to sell the Rolls Royce to satisfy her claim.

## VI.      MEASURE OF DAMAGES

### A.      Extent of the Equitable Lien and Constructive Trust

Imposition of the equitable lien and/or constructive trust on homestead property in circumstances where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead is limited to the extent of the invested funds. *Havoco of Am. v. Hill*, 790 So. 2d 1018 (Fla. 2001). In this case, it is undisputed that on Ms. Bentley used $98,000 of the proceeds she received from the sale of the Cord to pay off her mortgage. Therefore, the equitable lien and constructive trust cannot exceed the amount invested in homestead - $98,000.00.

Plaintiffs argue that they are entitled to an equitable lien and constructive trust in the amount of the invested proceeds plus pre-judgment interest relying on *Wiand v. Lee (In re Lee)*, 574 B.R. 286 (Bankr. M.D. Fla. 2017). However, *Wiand* is inapposite because in that case the court allowed pre-judgment interest because the court found that the entirety of the funds used to

purchase the home originated from the Ponzi scheme distributions and thus, the entire value of

the home was acquired with Ponzi scheme funds. *Id.* at 298. Here, only $98,000 of the value of

the home was acquired through the proceeds obtained from the sale of the Cord. Therefore,

Plaintiffs are not entitled to an equitable lien or constructive trust in excess of this amount, and

other than *Wiand*, they have not cited any case to the contrary.

## CONCLUSION

First, since both the Chapter 7 Trustee and Creditor failed to file a timely objection to the claim of exemption, the Court has no jurisdiction to subject Debtor's homestead property to an equitable lien or constructive trust, and the Trustee's objection under Rule 4003(b)(2) fails as a matter of law since Trustee does not claim that Debtor fraudulently asserted the exemption at the time she claimed it. Second, Creditor failed to establish that a valid debt existed in order to state a claim under 523(a)(2)(a), section 523(a)(4), and section 523(a)(6) because the alleged debt is barred by the statute of limitations as well as Creditor failed to establish the validity of the second promissory note. Third, Creditor failed to establish that Debtor transferred any property within a year of bankruptcy to state a claim under section 727(a)(2)(A). Finally, Creditor failed to provide any evidence to support her allegations that Debtor acted with an actual fraudulent intent and conspired with Belinda Horne in order to defraud and injure Creditor.

WHEREFORE, based on the aforesaid memorandum of law and closing argument,

Debtor requests that this Court grant her Motion to Allow Conveyance of Homestead Property,

overrule Trustee's Objection to Claim of Exemption, and dismiss the adversary complaints.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic transmission, if registered in the Electronic Case Filing System, otherwise by U.S. Mail to all parties receiving electronic notifications by the CM/ECF system in the above referenced case and adversary proceedings this 28th day of September, 2018.

/s/ Anna Handy, esq.
_____
Anna Handy, Attorney for Debtor Florida
Bar No.: 0119532 Anna Handy Law Firm,
P.A.
P.O. Box 730083
Ormond Beach, FL 32173
Telephone: 386-248-3000
Facsimile: 3 86-401-2511
anna.handy2015@gmail.com

Document comparison by Workshare 9 on Wednesday, October 3, 2018 9:28:25 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://PDC-DMS/Active/46539218/1 |
| Description | #46539218v1<Active> - Doc. 109 - Bentley Written Closing |
| Document 2 ID | interwovenSite://PDC-DMS/Active/46567183/1 |
| Description | #46567183v1<Active> - Dkt. 111 - Debtor's Closing Argument and Trial Memorandum of Law |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 286 |
| Deletions | 152 |
| Moved from | 16 |
| Moved to | 16 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 470 |